Richard T. KOENINGS, Plaintiff-Appellant and Cross-Respondent,

v.

JOSEPH SCHLITZ BREWING COMPANY, a Wisconsin corporation, and The Stroh Brewery Company, a foreign corporation, Defendants-Respondents and Cross-Appellants.†

Court of Appeals

*No. 84–1028. Submitted on briefs January 8, 1985.— Decided March 26, 1985.*
(Also reported in 368 N.W.2d 690.)

---

† Petition to review granted.

492

For the plaintiff-appellant and cross-respondent the cause was submitted on the briefs of *Capwell, Berthelsen, Nolden, Casanova & Pitts, Ltd.,* with *James A. Pitts* of counsel, of Racine.

For the defendants-respondents and cross-appellants the cause was submitted on the briefs of *Gibbs, Roper, Loots & Williams,* with *Clay R. Williams* and *Ellen E. Hill* of counsel, of Milwaukee.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

MOSER, J. Richard T. Koenings (Koenings) appeals from the trial court's order for judgment and

judgment which changed a jury verdict in favor of Koenings from $44,416.60 to zero. The Joseph Schlitz Brewing Company and The Stroh Brewery Company (collectively, Schlitz) cross appeal from that part of the judgment which granted to Koenings $3,282.99 in damages. We affirm that part of the judgment reducing the jury's verdict to zero, but we reverse that part of the judgment granting Koenings $3,282.99 in damages because he is not entitled to any damages and direct that a judgment be entered on remand dismissing the complaint.

Koenings joined Schlitz as a staff attorney in 1977. By 1980 he became a senior attorney in the seven-person legal department and in April, 1981, he was elected by the board of directors to the position of assistant corporate secretary.

In the summer and fall of 1981 Schlitz became the target of a friendly corporate takeover effort by G. Heileman Brewing Company (Heileman). The merger discussions fell through when the United States Department of Justice advised that it would oppose the merger.

In the midst of the Heileman takeover discussions, the Schlitz board of directors decided to offer contracts to seventy key management employees. On August 19, 1981, all seventy key employees were given essentially the same "golden parachute" employment contract, but with varying terms of employment. For example, Koenings' contract had a two-year term, while employees Lee Kordus and Robert Conners had contracts that only extended for one year, and the contract of general counsel Paul Fish (Fish) had a term of three years. Under the terms of the golden parachute contracts, if an employee's level of responsibility was substantially reduced, the employee could treat the reduction as a termination

by the company and could collect his or her salary for
the balance of the contract.[1]

[1] For purposes of this action, the pertinent portions of the
employment contract read as follows:

WHEREAS, the Company has engaged in discussions concern-
ing the possible acquisition of the Company's securities by another
company or companies, and the possible merger of the Company
with or into another company or companies; and

WHEREAS, such discussions and the attendant uncertainties
caused by such discussions have or may have an unsettling effect
on key management employees; and

WHEREAS, it is in the best interests of the Company that
such key management employees, including Employee, continue
to be employed by the Company, whether or not an acquisition or
merger of the Company occurs;

NOW, THEREFORE, and in consideration of the mutual cove-
ants and agreements hereinafter set forth and intending to be
legally bound by this Agreement, the parties have agreed as
follows:

1. *Term of Employment.* The Company hereby agrees to em-
ploy the Employee on a full-time basis for a period of not less
than one (1) year from the date hereof, subject to the terms
and conditions hereinafter set forth.

2. *Duties.* Subject to Paragraph 5B, the Employee agrees to
perform such duties and discharge such responsibilities on a full-
time basis as may be reasonably assigned to him from time to
time by the Company.

3. *Salary.* The Company will pay as compensation for the
Employee's services a base salary of not less than the base
salary in effect for the Employee on the date hereof.

4. *Benefits.* The Employee shall be eligible to participate
in all employee benefit programs currently available at the Com-
pany, as such programs may from time to time be amended and
so long as such programs are in effect, including but not limited
to:

> Medical
> Dental
> Vision
> Life
> Travel Accident
> Personal Accident Insurance
> Retirement Plan
> Tax Reduction Act Employee Stock Ownership Plan

It should be noted that in September, 1981, the president of Heileman acknowledged that Schlitz had proffered these employment contracts to key employees and said that if there was a merger Heileman would honor the agreements.

Subsequent to the failure of Heileman's takeover, Stroh placed an ad in *The Wall Street Journal* on March 29, 1982, offering to buy sixty-seven percent of the

---

and such other fringe benefit programs as are in effect as of the date hereof or hereafter made available by the Company. Employee shall also be entitled to the benefits equivalent to Transferred Salaried Employee Relocation Policy and Mortgage Interest Differential Plan as set forth in Exhibit A.

All prior rights granted the Employee under any of the above plans are not altered, extinguished, or affected by this Agreement, but are fully preserved.

5. *Termination Of The Agreement.*

A. The Company may terminate Employee's employment without cause upon fifteen (15) calendar days written notice during the term of this Agreement.

B. In the event of a substantial reduction in Employee's present level of responsibility, Employee may elect to treat such reduction as a termination by the Company under Paragraph 5A. Acceptance of such a reduction for a period of time up to three (3) months shall not be deemed to be a waiver of Employee's right to claim such reduction as a termination under Paragraph 5A.

C. Any termination pursuant to Paragraph 5A or Paragraph 5B shall obligate the Company to continue to pay Employee the salary described in Paragraph 3 for the balance of the term of this Agreement. Notwithstanding any termination pursuant to Paragraph 5A or Paragraph 5B, Employee will remain as an employee for the purposes of the benefits set forth in Paragraph 4 for the remaining term of this Agreement. If he is not vested at the end of the term of this Agreement, he shall receive a cash payment in the amount of the actuarial equivalent of his pension benefits accrued to the end of the term of this Agreement.

D. The provisions of Paragraph 5C shall not apply if Employee is terminated for (a) dishonesty, (b) conviction of a felony, or (c) breach of this Agreement, including any voluntary termination of this Agreement by Employee.

Schlitz stock at an above-market price of $15.50 per share. This offering resulted in a merger agreement between the board of directors of Schlitz and Stroh which occurred April 14, 1982. The merger agreement called for a price of $17 per share. On that date, Stroh beneficially owned 19,740,006 shares of Schulitz which was approximately sixty-eight percent of the 29,162,482 outstanding shares. The merger was completed at a special meeting of the stockholders on June 10, 1982, and Schlitz became a wholly owned subsidiary of Stroh.

After the merger agreement, Koenings went on vacation from May 19 to May 24, 1982, during which time he prepared a resume and sent out job applications to other companies. On May 25 he was asked by George E. Kuehn (Kuehn), vice president and general counsel of Stroh not to take a new job unless Koenings first talked to Kuehn. Kuehn further advised that he would get back to Koenings within two weeks regarding Koenings' position in the legal department. Sometime prior to June 11 Koenings had a job interview with Sydney B. Lilly (Lilly), executive vice president of Farmhouse Foods, Inc. (Farmhouse). On June 11, Koenings again met with Lilly and at that meeting Lilly offered Koenings a job at the same rate of pay that he had at Schlitz, but with different and fewer fringe benefits. Koenings accepted the offer. On that same day Koenings approached Fish, his superior at Schlitz, with a proposed letter of resignation citing his employment contract and the fact that his previous level of responsibility had been reduced. Fish asked him to wait until the following Monday. On June 14, Koenings again appeared in Fish's office and formally tendered a hand-written letter in which he elected to terminate his employment pursuant to paragraph 5B of the employment contract because of his reduced level of responsibility. At that time thirteen months remained on Koenings' contract. On

June 15, Roger Fridholm, the new president of Schlitz, rejected Koenings' request for termination under paragraph 5B as being contrary to fact, and advised him that Schlitz would treat his action as a voluntary termination of employment.

It must be noted that on June 14, Koenings spoke to an attorney who ultimately filed a complaint on Koenings' behalf against Schlitz and Stroh for breach of the employment contract and various other claims. All claims but one were dismissed by stipulation. The remaining claim was this breach of contract suit which was tried to a jury.

At trial, Koenings testified that he had many responsibilities in his position with Schlitz. Up to the time of the Stroh merger, his duties were to advise management about its marketed stock on the New York Stock Exchange and related problems arising with the Federal Securities and Exchange Commission. He advised the personnel department concerning employee stock option plans and he advised the marketing department concerning problems with the various state alcohol beverage commissions and the Federal Alcohol Administration Act. He also was responsible for advising the corporate officers concerning the various state and federal political action committee requirements and advising management on state and federal allowances or proscriptions against premium and coupon discounts, as well as licensing and labor laws.

Koenings exclusively handled the in-house legal work concerning an antitrust suit involving the Peter Hand Brewing Company. He conducted negotiations for the sale of Geyser Peak Winery and when the sale was not completed, he assumed general responsibility for all activities of this wholly owned subsidiary which had a $25,000,000 annual gross income. He became secretary of this corporation and handled all corporate legal ad-

vice. Koenings was responsible for seeing to the pension plan problems that occurred as a result of the closing of the Schlitz Milwaukee brewery under the Federal Multi-Employer Pension Plan Act of 1980. He also saw to the preparation of contracts and sale of the equipment of a Schlitz wholly owned Hawaiian brewery, and he prepared documents for management to rebut the federal justice department's claim that the Heileman takeover violated the federal antitrust laws.

Koenings testified that from April 14, 1982, the date of the Stroh merger agreement, to June 10, the date of the Schlitz stockholders' acceptance of the merger, his responsibilities in all the above matters were shifted to Stroh and he was literally reduced to paper shuffling. In this suit, he claimed his damages were thirteen months of salary equaling $50,916.66 (predicated on his 1982 salary of $47,000), vacation pay for four weeks amounting to $3,615.38, severance pay of eight weeks at $7,230.76, insurance due to medical bills paid in the amount of $1,489.12 and pension benefits of $3,000 or $4,000 for total damages of approximately $67,000.

Fish testified that Koenings' sphere of responsibility did not diminish from April 14 to June 10 other than would normally occur when merger negotiations were at hand. Fish testified that a number of things Koenings claimed were ongoing as of April 14 were actually completed before that date or shortly thereafter. Two other witnesses rebutted Koenings' claim that his responsibilities were reduced.

Uncontroverted evidence was presented at trial that after August 19, 1981, seventy key employees of Schlitz were given executive employment contracts for terms varying from one to three years. It is further uncontroverted that thirty management employees were terminated or elected to be terminated because of reductions in their level of responsibility, and all received

salary and fringe benefits under their golden parachute contracts with the exception of Koenings and one other. Kordus, Connors, Danny N. Sickbert and Fish all left because of diminished responsibility and all received their full benefits of pay and fringe benefits with no offset or mitigation, despite the fact that they had obtained new jobs before their respective employment contracts were up.

At the close of Koenings' case-in-chief and at the close of all testimony, Schlitz moved to dismiss on the basis that the stipulated damages clause in the contract was an unreasonable penalty and therefore was unenforceable as against Wisconsin public policy. Schlitz argued in the alternative that Koenings' income and fringe benefits at Farmhouse, valued at $55,000, should be set off in mitigation of his damages.

The trial court denied the dismissal motions but stated: "I don't think there's any question in my mind that this liquidated damages thing is unreasonable and, therefore, evidence of mitigation is allowed." The court also determined that whether Koenings' level of responsibility was reduced, whether he substantially performed under his employment contract, and whether he voluntarily terminated his employment, and the resultant damages, if any, were all questions of fact for the jury to decide.

The jury found that Koenings' level of responsibility was reduced, that he substantially performed his contract of employment, and that he did not voluntarily terminate his employment. The jury established his damages at $44,416.60 for loss of compensation (it rejected his claim for vacation and severance pay) and applied the salary he was earning on August 19, 1981, as the determinative salary, apparently rejecting Koenings' argument that his $47,000 salary at the time he was terminated should apply. It is also clear that the jury rejected the trial court's mitigation of damages instruc-

tion. The jury also found that Koenings was damaged in not receiving fringe benefits for medical expenses in the amount of $1,489.12 and actuarialized pension benefits in the amount of $1,793.87 for a total of $3,282.99 in fringe benefits.

On motions after verdict the trial court struck the jury's salary award of $44,416.60 and reduced the amount of salary loss to zero. The trial court held that the liquidated damage clause in Koenings' contract was an unreasonable penalty, that the clause was against public policy and that the jury failed to follow the instructions on mitigation of damages. The trial court, however, granted judgment to Koenings in the amount of $3,282.99 for the loss of fringe benefits under the contract. From this order for judgment and judgment, Koenings appeals and Schlitz cross appeals.

The issues on this appeal are whether or not the liquidated damage provision in the contract between Schlitz and Koenings was reasonable or unreasonable; whether, as a matter of law, Koenings voluntarily terminated his employment; and, considering the fact that Koenings earned more income and fringe benefits from his employment with Farmhouse than he did at Schlitz, whether the trial court erred in not reducing the total damages to zero.

## GOLDEN PARACHUTES

A golden parachute employment contract generally contains a continuation of salary provision for a stated time period after termination.[2] A number of factual situations may trigger the opening of the parachute,

[2] *See* Comment, *Golden Parachutes: A Perk That Boards Should Scrutinize Carefully*, 67 Marq. L. Rev. 293, 297 (1984) (hereinafter *Perks*) ; Comment, *Future Executive Bail Outs: Will Golden Parachutes Fill the American Business Skies?*, 14 Tex. Tech L. Rev. 615, 616–18 (1983) (hereinafter *Bailouts*).

or safe-landing provision of the contract, allowing the key employee to continue receiving a salary after termination of employment. The employee triggers the opening of the parachute when the target company, or takeover company, fires the employee, changes the employee's responsibilities, status, title, or forces relocation.[3] The proliferation of friendly as well as unfriendly takovers has led various corporate institutions to use these contracts. The terms of such employment contracts vary,[4] but generally they include termination provisions and severance benefits that are triggered by a change in corporate control.

Golden parachute proponents utilize three basic arguments to support the validity of such contracts. Under the retention theory, it is argued that the contracts are necessary to attract and retain competent executives; the defensive theory holds that such contracts make the cost of a takeover so high that unwanted suitors are effectively warded off; lastly, the nondistraction theory holds that by guaranteeing financial security to senior executives who are subject to possible dismissal or reduction of responsibility by a change of corporate control, the executives are allowed to continue to work unburdened by concern for their own futures during the takeover, meanwhile insuring that they will still act in the stockholders' best interests.[5] An added argument in favor of such contracts is that the dollar amounts due to the executives through these agreements are *de minimis* considered against the aggregate value of the takeover offer; thus, the contracts are proper.[6] The

---

[3] *Perks, supra* note 2, at 297–98.

[4] *Id.*

[5] *See* Winters, *Shark Repellents and Golden Parachutes: A Handbook for the Practitioner*, 425, 434 n. 3 (1983) (hereinafter *Shark Repellents*). One author terms the nondistraction theory as an economic risk allocation. *See Perks, supra* note 2, at 300.

[6] *Shark Repellents, supra* note 5, at 435–36.

validity of such executive contract benefits depends on their inherent reasonableness; they are more likely to be upheld if promulgated by a disinterested board of directors or a board committee.[7]

Schlitz argues that the use of the term golden parachute is a misnomer in this case because the contract did not contain a "change of control" triggering mechanism. We disagree because the preamble to the contract discusses acquisition of Schlitz by others or the possible merger with or into other companies.[8] The preamble also notes the unsettling effect such negotiations would have on key management, and specifies that these contracts were created by Schlitz's board of directors to maintain management during the period of such negotiations. It is relatively insignificant that the preamble does not contain the magic words "change of control"[9] and that it does contain the language that it is in the company's best interests that employees continue to be employed "whether or not an acquisition or merger of the Company occurs."

## REASONABLENESS OR UNREASONABLENESS

The trial court's determination that the contract itself was unreasonable is inexplicable, for if the contract was unreasonable, then it was against public policy as a penalty and no damages can ensue.[10] Regardless of what the trial court said, this court believes that what the trial court meant was that Koenings' contract, without a mitigation clause, was unreasonable. In other words, the trial court concluded that Koenings' salary

---

[7] *Id.* at 435.

[8] *See supra* note 1.

[9] *See, Shark Repellents, supra* note 5, at 437–46 on change of control.

[10] *Wassenaar v. Panos,* 111 Wis. 2d 518, 524, 331 N.W.2d 357, 360 (1983).

from Farmhouse had to be considered in deciding whether the stipulated damages clause in his Schlitz contract was unreasonable.

The trial court applied a totality of circumstances test in this case to determine the reasonableness of the stipulated damages clause which is a question of law.[11] Under the test established by the supreme court in *Wassenaar v. Panos,*[12] the following questions must be answered: (1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of the contract? (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach? Here the trial court rejected the first factor, intertwined the second and third factors and, viewing the stipulated damages clause from both the time of contracting and the time of the breach (prospective-retrospective approach), concluded that the damages provided for were disproportionate to the harm sustained. The trial court concluded that damages were easily ascertainable, that Wisconsin's black letter rule of mitigation of damages had to be applied and that the income earned by Koenings at Farmhouse had to be considered in determining his actual contractual loss. The trial court found that when mitigation was employed, Koenings was entitled to, at best, approximately $11,000 when weighing the income and fringe benefits at Farmhouse against the loss of income and fringe benefits at Schlitz.

We hold that the trial court correctly applied the mitigation of damages factor and found the stipulated damages clause to be a penalty on public policy grounds.

[11] *Id.* at 523–24, 331 N.W.2d at 360.
[12] *Id.* at 529–30, 331 N.W.2d at 362–63.

Public policy is a broad concept embodying the community common sense and common conscience.[13] The molders of public policy are the people of this state.[14] Three methods are generally employed to establish public policy: constitutional conventions and/or amendments, legislation and referenda. "[I]t is only when the people have failed to speak in these methods that the courts can be said to have power to make public policy by decision."[15] Courts should proceed cautiously when making public policy determinations.[16] The power to declare a contract or a contract clause void as being against public policy should be exercised only in cases free from doubt.[17]

Koenings argues that his golden parachute agreement is valid under the business judgment rule. Most academic commentators condemn defensive manipulations such as golden parachutes, but they grudgingly acknowledge that federal courts usually resort to a mechanical application of the business judgment rule to uphold such defensive tactics. The common law business judgment rule provides that directors or officers will not be held liable for a breach of fiduciary duty to the corporation or its stockholders for a mistake of fact or law that causes harm to the corporation or its stockholders, if the directors acted in a good faith exercise of their business judgment.[18] In the absence of fraud, bad faith,

---

[13] *Merten v. Nathan*, 108 Wis. 2d 205, 213, 321 N.W.2d 173, 178 (1982).

[14] *Borgnis v. Falk Co.*, 147 Wis. 327, 351, 133 N.W. 209, 216 (1911).

[15] *Id.*

[16] *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 573, 335 N.W.2d 834, 840 (1983).

[17] *Continental Ins. Co. v. Daily Express, Inc.*, 68 Wis. 2d 581, 589, 229 N.W.2d 617, 621 (1975).

[18] *See United Copper Sec. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263–64 (1917) (case in which business judgment rule

gross overreaching or abuse of discretion, good faith is presumed and courts will not interfere with the exercise of the business judgment by directors.[19] Commentators abhor this *laissez faire*, mechanistic approach and argue that all defensive tools employed by directors should be scrutinized in the light of the benefit or detriment to the stockholders and the specific conflict of interest involved.[20]

We believe that, in this context, the business judgment rule is archaic and unresponsive to fair treatment of stockholders. We agree with the academicians that tactics such as golden parachutes generally are in derogation of the fiduciary duties officers and directors owe to their stockholders. The effects of such tactics must be minimized. We agree with the scholars that management faced with merger suitors should maintain passivity and refrain from these types of activities. We hold that golden parachute contracts, as a matter of public policy, must have mitigation clauses.[21] Because such contracts bear the taint of conflict of interest in favor of the management-beneficiaries to the detriment of the stockholders' interest, such contracts are unreasonable without a mitigation clause and are unenforceable on public policy grounds as a penalty.[22] If the executive contract does not contain a mitigation clause, the law will impose mitigation in these circumstances.[23]

was first formulated); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 293–94 (7th Cir. 1981).

[19] *Id.*

[20] Easterbrook & Fischel, The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161, 1201–04 (1981).

[21] *See Shark Repellents, supra* note 5, at 489–94.

[22] *See Wassenaar, supra* note 10, at 528–29, 331 N.W.2d at 362–63.

[23] We must at this time note that our ruling in this case does not affect employment contracts of management employees ini-

We affirm the trial court's determination that the stipulated damages clause in Koenings' employment contract was unreasonable and therefore was against public policy as a penalty.[24] Consequently, it was proper to instruct the jury on mitigation. It follows that when the jury failed to consider mitigation, it was the duty of the trial court to reduce the jury's verdict by imposing a mitigation factor.

## VOLUNTARY OR INVOLUNTARY TERMINATION

Schlitz claims that the trial court erred in not granting its motion to dismiss at the close of Koenings' case-in-chief, at the end of all testimony, and on its motion after verdict. Schlitz argues that because the trial court stated: "I don't think there's any question that he [Koenings] left on his own, that he was not terminated by Schlitz," and that "[t]he man didn't, in my judgment, give Schlitz the opportunity to offer him a job," it erred in not ruling in favor of Schlitz on the motions. Schlitz argues that, regardless of the conflicting evidence adduced concerning whether Koenings' level of responsibility was reduced, Koenings voluntarily terminated his employment.

Koenings argues that, while the construction of his employment contract is a matter of law, before the court reaches the question of law, the jury must decide the evidentiary facts leading to that ultimate fact, that is whether he or Schlitz breached the contract under the reduction of responsibility clause.

tially hired with such terms in their contracts, because here we only address golden parachutes instituted because of merger suitors.

[24] *See Wassenaar, supra* note 10, at 528–29, 331 N.W.2d at 362–63.

The trial court held that the question of whether Koenings' termination was voluntary involved questions of fact to be answered by the jury. The questions for the jury included the following: was Koenings' level of responsibility substantially reduced before he left Schlitz; did he fail to substantially perform his obligation to Schlitz under this contract; and, did he voluntarily terminate his employment. The trial court properly placed the burden of proof as to the first question on Koenings and as to the second and third questions on Schlitz. The jury found that Koenings' level of responsibility was reduced before he left, that he substantially performed his duties under the contract, and that he did not voluntarily terminate his contract. The trial court refused the reinstituted motion for directed verdict and the motion after verdict to strike the answers to the above questions on the grounds that they were pure factual questions. It held that they were questions of fact to be decided by the jury on controverted evidence. We agree.

The standard of review of a jury verdict is that it will not be upset on review if there is any evidence in the record which supports it. The evidence is to be viewed in the light most favorable to the verdict, especially if it has the approval of the trial court.[25] The jury found that Koenings did not voluntarily terminate his contract, that his responsibilities were reduced and that he substantially performed his contract. Answering these questions required fact-finding by the jury and the trial court properly refrained from overruling the jury. Because issues of fact had to be determined by the jury before the trial court could construe the contract as a

[25] *Hareng v. Blanke*, 90 Wis. 2d 158, 162, 279 N.W.2d 437, 439 (1979).

matter of law, the trial court was correct in denying the motions for dismissal at the close of Koenings' case-in-chief, at the end of all testimony, and in the motions after verdict. We agree with and affirm the trial court.

## DAMAGES

The damages for wrongful termination of an employment contract are the foreseeable earnings contemplated in the contract reduced by the income earned in mitigation so that the employee is made economically whole for the harm suffered.[26]

Here Koenings claims he was entitled to damages based on his $47,000 yearly gross pay at the time he left Schlitz's employment. He also claims that he is entitled to the fringe benefits of vacation pay for four weeks at $3,615.38, executive insurance to cover his medical bills accumulated in the year after he left Schlitz's employment at a total cost of $1,489.12, severance pay which he calculated was $7,230.76, and accrued pension benefits of $3,500 to $4,000.

Koenings started his employment at Farmhouse on June 28, 1982, and worked there until July 8, 1983. His pay was $47,000 per year, the same amount that he was earning at Schlitz when he terminated his employment. He was paid six weeks severance pay by Farmhouse and was given one week's vacation pay. Koenings' pay at Farmhouse therefore totaled $53,326 (fifty-nine weeks at $903.84). This amount does not include amounts received for fringe benefits at Farmhouse, such as insurance, pension or profit sharing, because there is no testimony in the record concerning these amounts. The only statement in the record concerning fringe benefits is that they were less at Farm-

---

[26] See Wassenaar, supra note 10, at 534, 331 N.W.2d at 365.

house than at Schlitz. The jury found Koenings was entitled to $44,416.66, which equaled thirteen months pay at the annualized salary of $41,000 (the gross pay Koenings was earning on August 19, 1981, the date of the execution of his employment contract), and $3,282.99 for loss of fringe benefits. The trial court and both counsel agree that the amount awarded for fringe benefits by the jury is readily ascertainable as the sum of Koenings' out-of-pocket medical expenses in the amount of $1,489.12 and the actuarialized pension benefits due from Schlitz in the amount of $1,793.87. The jury rejected Koenings' claim for vacation and severance pay benefits.

Schlitz argues on cross appeal that Koenings should receive nothing because he voluntarily resigned and also argues that even if he did not voluntarily resign, he is still entitled to nothing because he made more at Farmhouse than he was entitled to receive under his employment contract. Schlitz asserts that the trial court erred by entering judgment in favor of Koenings for the amount of the fringe benefits. We agree with Schlitz.

Koenings' contract clearly and unequivocally spells out that if he takes advantage of the termination paragraph of the agreement, he is entitled to his monthly salary in effect at the date of the agreement (one-twelfth of $41,000) for the balance of the term of the agreement, which was thirteen months, totaling $44,416.-66.[27] It is also clear that he was entitled to executive medical benefits[28] for the thirteen months and it is uncontroverted that he spent $1,489.12 for such medical expenses during that thirteen-month period. It is also uncontroverted that he is entitled to $1,793.87 in pension

[27] *See supra* note 1, paragraph 3 of the employment contract.
[28] *See supra* note 1, paragraph 4 of the employment contract.

benefits.[29] He was not entitled to any severance benefits simply because this agreement was a severance agreement, nor was he entitled to vacation pay because vacation pay was included in his annual salary.

Because Koenings received $53,326[30] in pay from Farmhouse for the thirteen months of his contract term, Schlitz was entitled to have this amount set off in mitigation against his contractual damages. The jury found total damages of $47,699.65 for lost salary and fringe benefits. Therefore, he received more money from his Farmhouse employment than he was entitled to receive under his employment contract. It follows that the trial court erred in granting Koenings judgment for the fringe benefits found by the jury. On remand, the trial court must strike the jury verdict answer for fringe benefits and reduce the amount to zero and must grant judgment to Schlitz dismissing the complaint.

*By the Court.*—Order for judgment and judgment affirmed in part, reversed in part and cause remanded with directions.

---

[29] *See supra* note 1, paragraph 5C of the employment contract.

[30] We note that this calculation differs from that of Schlitz and the trial court. We arrive at $53,326 by simply noting that Koenings' salary was $47,000 per year at Farmhouse or $903.84 per week. He worked for Farmhouse at least a year before being terminated. He was given six weeks severance pay and one week vacation pay. This totaled 59 weeks of pay or a total of $53,326.