Richard T. KOENINGS, Plaintiff-Appellant and
Cross-Respondent-Petitioner,

v.

JOSEPH SCHLITZ BREWING COMPANY, a Wisconsin corpo-
ration, and The Stroh Brewery Company, a foreign
corporation, Defendants-Respondents and Cross-Ap-
pellants.

Supreme Court

*No. 84–1028.  Argued September 30, 1985.—*
*Decided November 26, 1985.*

(Also reported in —— N.W.2d ——.)

For the petitioner there was a brief by *James A. Pitts, Timothy M. Braun, Rex Capwell* and *Capwell, Berthelsen, Nolden, Casanova & Pitts, Ltd.*, Racine, and oral argument by *Rex Capwell.*

For the defendants-respondents and cross-appellants there was a brief by *Clay R. Williams, Gregory G. Wille, Ellen E. Hill* and *Gibbs, Roper, Loots & Williams*, Milwaukee, and oral argument by *Clay R. Williams.*

LOUIS J. CECI, J.   This is a review of a published decision of the court of appeals, *Koenings v. Joseph Schlitz Brewing Co.*, 123 Wis. 2d 490, 368 N.W.2d 690 (Ct. App. 1985), which affirmed in part and reversed in part the order for judgment and judgment of the Milwaukee county circuit court, Michael J. Barron, circuit judge.

This case is a dispute over the validity of a stipulated damages clause in an employment contract where an employee elected to be terminated and receive the stipulated damages amount under his employment contract. We hold that under the totality of the circumstances test, the

stipulated damages clause is a legally enforceable liqui-
dated damages clause. [1]

The trial court, in ruling as a matter of law that the
damages clause was unreasonable, applied the doctrine
of mitigation of damages and changed a jury verdict in
favor of former employee Richard T. Koenings from
$44,416.66 (representing lost salary) to zero. The court
of appeals affirmed. The former employer, the Joseph
Schlitz Brewing Company (Schlitz), and its corporate
parent, The Stroh Brewery Company (Stroh), cross-ap-
pealed from that part of the verdict and judgment which
granted Koenings $3,282.99 in damages, representing
Koenings' loss of fringe benefits. The court of appeals
reversed. We reverse the court of appeals and remand
the case to the trial court with instructions to reinstate
the verdict.

The issue in this case is essentially one of reasonable-
ness of a stipulated damages clause in an employment
contract. Did the trial court err in concluding that, as
a matter of law, the stipulated damages clause in the
Koenings/Schlitz employment contract was unreason-
able, thereby subjecting Koenings to the doctrine of miti-
gation of damages? If the stipulated damages clause
was unreasonable, did the court of appeals err in extend-
ing the doctrine of mitigation of damages to Koenings'
fringe benefit damages award? We find *Wassenaar v.
Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983), con-
trolling and hold that, under the totality of the circum-
stances, the stipulated damages clause was reasonable.
It was error, therefore, for the circuit court to apply
the doctrine of damage mitigation and to change the
jury verdict with regard to the salary award. The court

---

[1] The terms "stipulated damages" and "liquidated damages,"
respectively, have the same meaning which they had in *Wassenaar
v. Panos*, 111 Wis. 2d 518, 521, 331 N.W.2d 357 (1983). "We
use the term 'stipulated damages' herein to refer to the contract
and the term 'liquidated damages' to refer to stipulated damages
which a court holds to be reasonable and will enforce."

of appeals likewise erred in affirming the trial court and in extending the mitigation doctrine to the fringe benefit award. Because the clause is reasonable, we do not address whether the mitigation of damages doctrine applies to a fringe benefit award where the stipulated damages clause is unreasonable.

Robert Koenings graduated from law school with a joint J.D. and M.B.A. degree in 1975. He began his employment with Schlitz in 1977, when he was hired as a staff attorney. At the time, Schlitz was the second largest brewer in the United States.

Koenings rose within the ranks of the Schlitz legal department. He became a senior attorney in 1980 and was elected assistant corporate secretary in 1981. Paul Fish, general counsel at Schlitz during this time, testified at trial that Koenings was a highly valued member of his staff.

During 1981, Schlitz became a potential target for a corporate takeover for several reasons, among them Schlitz's declining sales and its production overcapacity. Schlitz and the G. Heileman Brewing Company, which had a need for increased brewing capacity, entered into friendly merger negotiations during May or June 1981.

Schlitz, pursuant to these merger negotiations, drafted and extended employment contracts to seventy of its key employees. The drafters included members of the Schlitz legal department, excluding Koenings, and outside counsel retained by Schlitz. The contracts basically gave Schlitz the right to terminate an employee without cause and the employee the right to elect to be terminated if he felt his duties were substantially reduced by Schlitz. In either case, the employee would receive his salary and fringe benefits for the duration of the agreement.

The purpose of the employment contracts, according to testimony at trial, was to allow the key management employees to feel secure in their jobs over the course of the takeover negotiations. Feeling more secure, the employees would be less inclined to leave their respec-

tive positions because of the uncertainty wrought by the merger negotiations. The board of directors of Schlitz thought that the contracts would be in the best interests of Schlitz because the contracts would ensure that key employees remain with the company during the negotiations and that Schlitz could thereby continue unimpaired brewery operations. Koenings entered into his two-year employment contract on August 19, 1981, during the midst of the Heileman/Schlitz negotiations. He was earning $41,000.00 annually at the time the contract was signed.

The merger negotiations were discontinued when the United States Department of Justice indicated in October, 1981, that it would oppose the merger because of perceived antitrust violations. Schlitz then became involved in merger negotiations with Stroh; a merger between the two was undertaken and consummated between April and June of 1982.

A reorganization and condensation of the legal departments of the two brewers followed the merger. At the time of trial, there were only five attorneys in the merged legal department of the Stroh/Schlitz combination; by contrast, there were nine attorneys comprising the two staffs prior to the merger.

In June, 1982, Mr. Koenings felt that his responsibilities within the Schlitz legal department had been reduced sufficiently as a result of the merger to warrant his exercising the termination election clause of his employment contract, paragraph 5B.[2] On June 14, 1982,

---

[2] Paragraph 5 of the contract states,

"5. *Termination Of the Agreement.*

"A. The Company may terminate Employee's employment without cause upon fifteen (15) calendar days written notice during the term of this Agreement.

"B. In the event of a substantial reduction in Employee's present level of responsibility, Employee may elect to treat such reduction as a termination by the Company under Paragraph 5A. Acceptance of such a reduction for a period of time up

he elected to treat such responsibility reduction as a termination of his employment and notified Paul Fish by letter of his decision. He also requested information from Schlitz regarding the amount due him under the stipulated damages clause of the contract, paragraph 5C.[3]

On June 15, 1982, the new Schlitz president, Roger Fridholm, responded to Koenings. He stated in his letter that Schlitz disagreed with Koenings' interpretation that his job responsibilities were substantially reduced. Schlitz treated Koenings' termination as a voluntary act and, therefore, refused to pay Koenings his salary and benefits under the stipulated damages clause of the contract. On this same date, the Schlitz board of directors failed to reelect Koenings to his position as assistant secretary of Schlitz. Without waiving any other rights, Koenings reiterated his elected termination on June 17, 1982, citing "the substantial reduction in [his] level of responsibility which has resulted from [his] no longer being an officer of the company." Schlitz continuously maintained that Koenings' election to consider himself

---

to three (3) months shall not be deemed to be a waiver of Employee's right to claim such reduction as a termination under Paragraph 5A.

"C. Any termination pursuant to Paragraph 5A or Paragraph 5B shall obligate the Company to continue to pay Employee the salary described in Paragraph 3 for the balance of the term of this Agreement. Notwithstanding any termination pursuant to Paragraph 5A or Paragraph 5B, Employee will remain as an employee for the purposes of the benefits set forth in Paragraph 4 for the remaining term of this Agreement. If he is not vested at the end of the term of this Agreement, he shall receive a cash payment in the amount of the actuarial equivalent of his pension benefits accrued to the end of the term of this Agreement.

"D. The provisions of Paragraph 5C shall not apply if Employee is terminated for (a) dishonesty, (b) conviction of a felony, or (c) breach of this Agreement, including any voluntary termination of this Agreement by Employee."

[3] *See,* n. 2, *supra.*

terminated under paragraph 5B of the contract was without justification; in other words, Schlitz believed that his job responsibilities were not substantially reduced.[4]

After the completion of the Stroh/Schlitz merger and prior to his termination election on June 14, 1982, Koenings began looking for another position on a corporate counsel staff. He accepted such a position with the Farmhouse Food Corporation (Farmhouse) contemporaneously with his termination election with Schlitz. His annual salary with Farmhouse was $47,000.00, the same as his final annual salary with Schlitz. He worked for Farmhouse for approximately thirteen months; he then entered into the private practice of law in July of 1983. Evidence produced at trial indicated that Koenings' total compensation for his thirteen months at Farmhouse, including salary and fringe benefits, was $55,134.55.

When Schlitz failed to pay under the stipulated damages clause of his employment contract, Koenings brought this suit. He demanded that Schlitz pay his $47,000.00 final annual salary and other fringe benefits for the thirteen-month period remaining on his contract.[5]

The trial court, at the close of all testimony, denied Schlitz's dismissal motion but ruled that the stipulated damages clause was unreasonable, and, therefore, evi-

[4] Although Schlitz and Stroh petitioned this court to review the jury's verdict that Koenings' duties were substantially reduced, we declined to review that part of the verdict. We accept the jury verdict regarding Koenings' job responsibility reduction as correct; therefore, we assume that Koenings' responsibilities were substantially reduced and that he acted pursuant to the terms of the contract in electing termination from Schlitz.

[5] However, paragraphs 3 and 5C of the employment contract only provided that, in addition to fringe benefits, a terminated employee would receive "a base salary of not less than the base salary in effect for the Employee on the date" of signing the contract. Koenings was earning a base salary of $41,000.00 on the date he signed his contract.

dence of mitigation of damages was allowable, per *Wassenaar*, 111 Wis. 2d 518. The court then instructed the jury that the proper measure of damages in this case, if the employer was found to have breached the contract, would be the amount of unpaid salary and fringe benefits under the unexpired term of the employment contract, reduced by what the employee could reasonably have earned during the unexpired term.

In a special verdict,[6] the jury determined that Koenings' work responsibilities were substantially reduced

---

[6] The jury returned the following special verdict:

*"SPECIAL VERDICT*

"FIRST QUESTION: Were Richard Koenings' responsibilities as an attorney with the Jos. Schlitz Brewing Company substantially reduced *before his acceptance of other employment?*

"Yes    X          No _____

"SECOND QUESTION: If you answer Question No. 1 'Yes,' then answer this question:

"Did Richard Koenings fail substantially to perform his obligations under his employment agreement contract with Schlitz?

"Yes _____          No    X

"THIRD QUESTION: If you answer Question No. 1 'Yes,' then answer this question:

"Did Richard Koenings voluntarily terminate his employment with Schlitz under Paragraph 5D of the agreement?

"Yes _____          No    X

"FOURTH QUESTION: If you answer Question No. 1 'Yes,' then answer this question:

"What amount of money will fairly and adequately compensate Richard Koenings for any damages sustained by him as a natural and probable result of the termination of his employment with Schlitz with respect to:

"A. Loss of any compensation, including salary, vacation, and/or severance pay during the balance of the employment contract?

"$44,416.66

and that Koenings was not in breach of the contract. The jury, apparently ignoring the mitigation of damages instruction, awarded him loss-of-salary damages of $44,416.66 based on a thirteen-month extrapolation of Koenings' annualized salary of $41,000.00 at the time the contract was signed, pursuant to the stipulated damages clause of the contract. It also awarded him $3,282.99 in fringe benefit losses.

On motions after verdict, the trial court denied Schlitz's motion for a directed verdict and, alternatively, its motion for judgment notwithstanding the verdict. But it changed Koenings' salary loss award of $44,416.66 to zero, because evidence at trial indicated that Koenings' damages were wholly mitigated by his earnings while at Farmhouse. The court observed that because the jury awarded Koenings the whole of his annualized $41,000.00 salary had he remained at Schlitz, the jury ignored the mitigation instruction. The trial court left the fringe benefit award intact because it did not know whether the doctrine of mitigation of damages applies to fringe benefits.

The court of appeals affirmed the salary award elimination, holding that the trial court correctly ruled the stipulated damages clause to be unreasonable and, therefore, a penalty, which requires the mitigation doctrine be applied. It also held that employment contracts entered into pursuant to merger negotiations—sometimes referred to as golden parachutes—must include mitigation clauses, as a matter of public policy. Finally, the court of appeals held that the doctrine of mitigation of

"B. Loss of any fringe benefits during the balance of the employment contract?

"$ 3,282.99

"Dated at Milwaukee, Wisconsin, this 21 day of February, 1984."

damages must apply to the fringe benefits award as well as to the salary award.

In holding the stipulated damages clause to be unreasonable, the trial court correctly noted that the validity of the stipulated damages clause is a question of law, *Wassenaar*, 111 Wis. 2d 518, while the issue of whether Schlitz was in breach of the contract is a factual determination for the jury. But a trial court's decision concerning the validity or invalidity of a clause involves factual and legal determinations, and they will be reviewed as such. *Id*. at 525. The factual determinations supporting the legal conclusion will be upheld unless they are contrary to the great weight and clear preponderance of the evidence. *Id*. The legal standard of the validity of a stipulated damages clause is one of reasonableness. Whether the facts fulfill the legal standard is a question of law. An appellate court need not defer to the trial court's determination on a question of law, although it should be given weight where the legal and factual determinations are intertwined, as they are here. *Id*.

Although both sides to this litigation, the trial court, and the court of appeals acknowledge that *Wassenaar* is controlling in considering the validity of a stipulated damages clause in an employment contract, Koenings and the court of appeals speak at some length to some apparent significance of whether this contract is a so-called golden parachute contract.

Koenings argues that a golden parachute contract is an employment contract which is used to protect the employer-corporation by inducing key employees to remain in their present employment during times of corporate uncertainty, such as during a period of merger negotiations. Other writers define a golden parachute as an agreement between an executive and his or her company whereby the company agrees to pay certain benefits in

the event of a change of control of the company.[7] In other words, golden parachutes are termination agreements which shelter executives from the effects of a corporate change in control.[8] The U. S. Supreme Court has recently considered the term:

"The term 'golden parachute' refers generally to agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change of corporate ownership." *Schreiber v. Burlington Northern, Inc.*, —— U.S. ——, 105 S. Ct. 2458, 2460 n. 2 (1985).

The agreement is deemed golden because the compensation granted the executive may be very lucrative for the executive. Regardless of the type of compensation granted, virtually all golden parachutes are triggered by a change of corporate control. ABA Subcommittee on Executive Compensation, *Executive Compensation: A Road Map for the Corporate Advisor*, 40 Bus. Law. 219, 349 (1984).

Koenings considers it important to his argument that he demonstrate that the employment contract is a golden parachute. He apparently believes that labeling the contract a golden parachute automatically invokes the business judgment rule. Under the business judgment rule, Koenings asserts that this court should not interfere with Schlitz's decision to include the stipulated damages clause within the employment contract. The court of appeals noted that the common-law business judgment rule provides that corporate officers or directors will not be held liable for a breach of fiduciary duty to the corporation

---

[7] *See, e.g.*, ABA Subcommittee on Executive Compensation, *Executive Compensation: A Road Map for the Corporate Advisor*, 40 Bus. Law. 219, 348 (1984).

[8] Note, *Golden Parachutes and the Business Judgment Rule: Toward a Proper Standard of Review*, 94 Yale L.J. 909 (1985).

or to the shareholders if the breach was a result of a good-faith exercise of the officers' or directors' business judgment. *Koenings*, 123 Wis. 2d at 504 (Ct. App. 1985). However, the court of appeals' ruling that the business judgment rule is "archaic and unresponsive to fair treatment of stockholders [in the context of golden parachutes]," *id.* at 505, is premature and wholly unwarranted. The court of appeals' language is, at best, dicta. The business judgment rule is inappropriately presented in this case and is unnecessary to support our determination that the stipulated damages clause is reasonable under the totality of the circumstances.

We deem it unnecessary in the final analysis to determine whether Koenings' employment contract is a golden parachute. Characterizing the contract as a golden parachute will not by itself invoke the business judgment rule, which is Koenings' ultimate thrust. The term "golden parachute" is not by itself legally significant, nor is it legally conclusive. It is merely descriptive of a certain type of employment contract given to top corporate executives and triggered by a change of corporate control.

In this case, we review only the trial court's determination of the validity of the stipulated damages clause. We certainly do not pass judgment on the legality of golden parachutes as a corporate tool to provide job security to key employees, or, as they are sometimes used, as a defensive measure to a corporate takeover. *See, e.g.*, Comment, *Golden Parachutes: A Perk That Boards Should Scrutinize Carefully*, 67 Marq. L. Rev. 293, 307 (1984). Thus, the court of appeals spoke in error in holding that golden parachute contracts must include mitigation clauses as a matter of public policy. *Koenings*, 123 Wis. 2d at 505. We do not hold that employment contracts—whether or not characterized as golden parachutes—must necessarily include mitigation clauses. Be-

cause we limit our inquiry here to the reasonableness of the stipulated damages clause within the employment contract, we find the analytical framework of *Wassenaar* sufficient to decide this case.

As in *Wassenaar*, the instant case concerns the breach of an employment contract by an employer, and the contract here also includes a stipulated damages clause. We stated in *Wassenaar* that the test which a court should apply in determining the validity of a stipulated damages clause "is whether the clause is reasonable under the totality of circumstances." *Wassenaar*, 111 Wis. 2d at 526. (Footnote omitted.) If the clause is reasonable, then the employee's damages "should not be reduced at trial by [an] amount [the] employee did earn or could have earned." *Id.* at 520. In other words, whether the employee mitigated his losses is irrelevant if the stipulated damages clause is found to be reasonable. Nevertheless, evidence of an employee's subsequent earnings may be initially considered in determining the reasonableness of the clause. *See, id.* at 542.

*Wassenaar* established a general framework within which a court is to consider the validity of stipulated damages clauses. Although the ultimate test is one of reasonableness under the totality of the circumstances, several factors may be considered in determining reasonableness. These factors include: (1) Did the parties intend to provide for damages or for a penalty?; (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract?; and (3) Are the stipulated damages a reasonable forecast of harm caused by the breach? *Wassenaar*, 111 Wis. 2d at 529–30. These factors are neither exclusive nor necessarily conclusive of the reasonableness of a stipulated damages clause. They are not elements comprising a definitive test, but merely considerations within the

total realm of circumstances which give rise to the validity or invalidity of such a clause.

We suggested in *Wassenaar* that, in order to assist appellate review, the trial court should delineate in separate findings of fact and conclusions of law the validity of the stipulated damages clause. Although there are not separate findings or conclusions in the record, the trial transcript reveals that the trial court took care to consider the factors mentioned in *Wassenaar*.

The first factor—whether the parties to the contract intended to provide for damages or for a penalty—was dismissed by the trial court as rarely helpful. Indeed, what the parties intended in fact in creating the stipulated damages clause has little relevance to what is reasonable in law. *Wassenaar*, 111 Wis. 2d at 530. It is more efficacious for a court to consider the circumstances which give rise to the formation of the contract rather than to consider the intent of the parties. *See*, Restatement (Second) of Contracts, sec. 356(1), comment c (1979). Nevertheless, the parties' intent may have some evidentiary value. *Wassenaar*, 111 Wis. 2d at 530.

Evidence at trial indicated that neither Koenings nor Schlitz intended that the stipulated damages clause was unreasonable as a penalty. Koenings testified that he understood the stipulated damages clause to be his "damages in case of a breach by or termination by Schlitz." Paul Fish, who was intimately involved in the contract-drafting process, testified that the clause was not a penalty.

We do not give lengthy consideration to evidence presented by Koenings that other key Schlitz employees, with employment contracts virtually identical to Koenings', received payments from Schlitz under their respective stipulated damages clauses upon Schlitz's similar breaches. Such evidence mainly addresses Schlitz's in-

tent regarding the damages clause. Neither Schlitz's practice of nor its intent in honoring similar stipulated damages clauses significantly advances our analysis of the reasonableness of the present clause under the totality of the circumstances.

The second factor—the "difficulty of ascertainment" test—assists in determining the reasonableness of the clause. The greater the difficulty of ascertaining damages due to breach, the more probable it is that the stipulated damages are reasonable. *Wassenaar,* 111 Wis. 2d at 530–31. In other words, this factor directs that where damages are inherently difficult to determine, greater latitude will be afforded the parties in setting the amount of a stipulated damages clause.

The third factor—does the clause represent a reasonable forecast of harm caused by the breach—is intertwined with the second factor. As we said in *Wassenaar,* "[c]ourts test the reasonableness of the parties' forecast, as they test the 'difficulty of ascertainment' by looking at the stipulated damages clause from the perspective of both the time of contracting and the time of the breach (or trial)." *Id.* at 531. That is, anticipated harm at the time of contract formation and actual harm at the time of breach or trial must both be considered in determining reasonableness of a stipulated damages clause. *Id.* at 532.

The trial court found that the "obvious answer" to the question whether Koenings' harm was difficult to accurately estimate at the time of contracting was "no." It stated that salary, vacation pay, and severance pay could be easily estimated by checking corporate records to determine the amount of Koenings' vacation time and severance benefits. The court then inferred that, simply because Koenings' anticipated damages could be easily ascertained, the stipulated damages clause was unreasonable. But it is not enough that anticipated damages

are easily ascertainable to support an inference that a stipulated damages clause is unreasonable; anticipated and stipulated damages must significantly diverge from each other before the stipulated damages clause will appear to be unreasonable. To the extent that stipulated damages and anticipated damages are similar, the stipulated damages clause will appear to be reasonable. *See, e.g., Madison v. American Sanitary Engineering Co.*, 118 Wis. 480, 503–04, 95 N.W. 1097 (1903). By stating that salary, vacation pay, and severance pay are easily estimated, the trial court is implying that loss of salary, vacation pay, and severance pay *are* Koenings' anticipated damages and that they approximate the stipulated damages. We agree in part; for reasons discussed below, we believe that Koenings' consequential damages also should have been included by the trial court in determining his anticipated damages. Because the stipulated and anticipated damages approximate each other and do not diverge, the stipulated damages clause appears to be reasonable in a prospective inquiry, even though the trial court did not consider Koenings' consequential damages.

The trial court also implied that Koenings' actual damages are easily estimated. It attempted to calculate actual damages at the time of trial. Koenings earned approximately $55,000.00 in salary and severance pay during his thirteen months at Farmhouse. The trial court found that he would have earned approximately $51,000.00—based on his $47,000.00 final annual salary and $4,000.00 more in fringe benefit payments—during the same thirteen-month period with Schlitz. Evidence of an employee's earnings after termination may be relevant in initially determining the reasonableness of the stipulated damages clause. *Wassenaar*, 111 Wis. 2d at 542. Because Koenings was requesting total damages of approximately $66,700.00, the trial court reasoned that

the most actual damage which Koenings reasonably could have sustained was $11,700.00.

The trial court concluded that the value of the stipulated damages clause, $66,700.00 according to Koenings, was unreasonable in light of the anticipated and actual forecast of harm caused by the breach: "[T]here is no question . . . that this would be a total windfall to Mr. Koenings if he was successful." It stated that the stipulated damages clause in effect was giving Koenings "double pay" for the same period of time on damages which were easily ascertainable. But, again, ease of ascertainability of damages does not militate against the reasonableness of a damages clause where stipulated and anticipated damages are similar, as they are here. Only the stipulated and the actual damages tend to diverge, and only then because Koenings' consequential damages were not included by the trial court in its retrospective damage inquiry.

The trial court concluded that consequential harm was not intended by the parties to be included in the stipulated damages clause. The general rule regarding breach of contract damages where a stipulated damages clause exists is to allow such damages to the extent that those damages are reasonably contemplated by the parties at the time of the contract. *See, Martinson v. Brooks Equipment Leasing, Inc.*, 36 Wis. 2d 209, 222, 152 N.W. 2d 849, 154 N.W.2d 353 (1967). Parties to a contract may account for damages not usually awarded by law within the stipulated damages clause. *Wassenaar*, 111 Wis. 2d 518. The test is whether the parties contemplated the inclusion of consequential damages within the stipulated damages clause. *See, e.g., Smith v. Beloit Corp.*, 40 Wis. 2d 550, 559, 162 N.W.2d 585 (1968).

We disagree with defendants' contention and the trial court's conclusion that consequential damages were not

within the contemplation of the parties at the time of the contract formation. Although our reading of the record discloses no direct testimony of intent to include consequential damages within the stipulated damages provision, the language of the contract itself indicates that the parties contemplated the inclusion of Koenings' consequential damages in the event of breach. Absent ambiguity within the document, the construction of a contract presents a question of law. *Lakeshore Commercial Fin. Corp. v. Drobac,* 107 Wis. 2d 445, 452, 319 N.W. 2d 839 (1982). We find the contract between Schlitz and Koenings to be unambiguous. In addition,

" '[T]he office of judicial construction is . . . to determine what the parties contracted to do; not necessarily what they intended to agree to, but what, in a legal sense, they did agree to, as evidenced by the language they saw fit to use.' " *Miller v. Miller,* 67 Wis. 2d 435, 442, 227 N.W.2d 626 (1975). (Citations omitted.)

Moreover, an agreement should be given a reasonable meaning so that no part of the contract is surplusage. *Hastreiter v. Karau Buildings, Inc.,* 57 Wis. 2d 746, 748–49, 205 N.W.2d 162 (1973).

Paragraph 5A of the contract states,

"The Company may terminate Employee's employment without cause upon fifteen (15) calendar days written notice during the term of this Agreement."

Paragraph 5B of the contract states in relevant part,

"In the event of a substantial reduction in Employee's present level of responsibility, Employee may elect to treat such reduction as a termination by the Company under Paragraph 5A. . . ."

These two provisions, taken together, attest to the parties' intention to protect not only the continuation of Koenings' salary in the event of outright termination, but also to safeguard Koenings' status within the Schlitz

legal department. If the two parties, Schlitz and Koenings, were solely concerned with ensuring that Koenings had a certain salary for the two-year period, there would be no need for paragraph 5B; Koenings would still receive his normal salary even if his job responsibilities were substantially reduced. Inclusion of paragraph 5B in the contract, however, evinces Schlitz's and Koenings' intent to protect Koenings against something more than just actual job termination and attendant salary loss. We find that the parties also intended to protect Koenings against the consequential damage to his status from a reduction of his job responsibilities within the department. That, at least, is what they agreed to in a legal sense, as evidenced by the contract language.

We likewise disagree with defendants that Koenings sustained no actual harm at all. Koenings certainly suffered consequential losses as a result of the elected termination of his employment. He suffered, per the jury's determination, a substantial reduction in his job responsibilities. There was testimony presented at trial that Schlitz, at the time of the takeover, had one of the best in-house legal departments in the country; Koenings' elected termination forced him to forego extramonetary remuneration in the form of job satisfaction in working for a prestigious corporate legal department. It also forced him to forego career advancement opportunities with Schlitz commensurate with his seniority and skills. Koenings testified that his departure from Schlitz was a "great leap backwards" to his professional career. He never had the level of decision-making authority with Farmhouse that he had with Schlitz. He testified that he lost a level of professional respect which he would have retained had he been able to remain with Schlitz. It is also conceivable that Koenings' marketability within the legal profession was damaged as a result of his

constructive termination. The substantial reduction of his job responsibilities and the elimination of his title of assistant corporate secretary to Schlitz would adversely affect his ability to find another position with similar responsibilities as he had with Schlitz.

We conclude that when Koenings' consequential damages are included in the prospective-retrospective analysis of the second and third *Wassenaar* factors, the stipulated damages clause is reasonable. It is difficult to estimate his loss of job status, the loss of opportunity for advancement with Schlitz, and other consequential injury in monetary terms, either at the time of the contract formation or at the time of trial. As we stated in *Wassenaar,*

"Consequential damages may be difficult to ascertain at the time of contracting or breach and are difficult to prove at trial. The contract formula of full salary for the period after breach seems to be a simple and fair way of calculating all damages." 111 Wis. 2d at 537.

With this in mind, we hold that the stipulated damages clause was a reasonable forecast of Koenings' anticipated and actual damages as a result of the breach.

Defendants assert that a retrospective inquiry of the reasonableness of the damages forecast indicates that Koenings received $6,000.00 more at Farmhouse than he would have received had he stayed with Schlitz for the duration of the contract. But defendants do not consider Koenings' consequential damages resulting from the constructive breach. And even if Koenings did receive $6,000.00 more at Farmhouse than he would have received at Schlitz during the same time period, we find no gross disproportion between the amount of actual harm sustained and the amount of damages stipulated within the contract. *See, id.* at 532. Koenings suffered a loss of status and attendant damages as a result of his constructive termination. The stipulated measure of

damages is reasonable compensation for all of Koenings' damages.

Inquiry into the validity or invalidity of a stipulated damages clause does not necessarily end with a consideration of the three *Wassenaar* factors. A trial court must consider the totality of circumstances giving rise to the stipulated damages clause. Additionally, the trial court should consider "the policies that gave rise to the adoption of the reasonableness test as the test for distinguishing between enforceable liquidated damages provisions and unenforceable penalty provisions." *Wassenaar*, 111 Wis. 2d at 533. (Footnote omitted.) Although the trial court did not consider such policies or factors in this case, at least not on the record, we choose to consider additional factors in reaching the conclusion that the stipulated damages clause in Koenings' employment contract is reasonable under the totality of the circumstances.

The reasonableness test is a compromise between the parties' freedom to contract, as evidenced in the stipulated damages clause, and the belief that a stipulated damages clause in excess of injury may amount to an objectionable *in terrorem* agreement. *Id.* at 528. An *in terrorem* agreement, i.e., a penalty, would undermine the theory of compensatory remedy for contract breach.[9] To state a variation on this theme, it would be inefficient to force a party to fully perform a contract when breaching it would make economic sense, but for a large stipulated damages clause.[10]

Another circumstance we consider important is where, as here, the employer desires to quell the fears of its employees that they may lose their jobs should a takeover occur. In this case, Schlitz wished to have its key

[9] Restatement (Second) of Contracts, Section 356, comment a (1979).

[10] *See,* R. Posner, *Economic Analysis of Law,* 88–93 (2d ed. 1977).

employees enter into employment contracts during its merger negotiations with Heileman. The purpose of the contracts was to afford employees "the assurance of [job] continuity during what were admittedly rough times," as Paul Fish so testified. In addition, one of the recital clauses to the contract read as follows:

"WHEREAS, such [merger] discussions and the attendant uncertainties caused by such discussions have or may have an unsettling effect on key management employees . . . [the parties hereby enter into this contract] . . . ."

This language further suggests that Schlitz desired to assuage the employees' fears of their job status and income continuation. In such a situation, the stipulated damages clause may be the best method to satisfy employee uncertainty. The stipulated damages clause in effect serves as an employee insurance policy against job and status loss.[11] We believe this factor—whether the stipulated damages clause is used to satisfy employee job status and salary uncertainty—to be a valid consideration in determining the overall reasonableness of a stipulated damages clause.

Officers for Schlitz testified that Schlitz offered its key management employees term employment contracts because it did not want them to leave Schlitz for other employment during the period of its Heileman merger negotiations. In other words, offering the term contract with the stipulated damages clause was a method of purchasing employee loyalty during a time of employee uncertainty. Schlitz brewery operations conceivably could have been interrupted during the negotiation period if key employees had left Schlitz's employ. Rather than taking such a risk, Schlitz satisfied its need for greater corporate loyalty and lower employee attrition

---

[11] Clarkson, Miller and Muris, *Liquidated Damages v. Penalties: Sense or Nonsense?*, 1978 Wis. L. Rev. 351, 369 n. 57.

through the vehicle of a stipulated damages clause. The key employees' risk of salary and status loss was theoretically diminished, loyalty increased, and attrition decreased through the stipulated damages component of the contract.[12] It is a valid economic purpose to attempt to lower employee attrition during a period of company uncertainty; use of a stipulated damages clause under these circumstances is a consideration in determining the clause's reasonableness.

The touchstone of the reasonableness under the totality of the circumstances test must still be the relationship of anticipated and actual harm to the stipulated amount of damages, as expressed in the *Wassenaar* factors. But stipulated damages clauses may also be enforceable under the totality of the circumstances where they serve other valid economic purposes, such as allaying fears of job security or purchasing corporate loyalty. The Koenings/Schlitz stipulated damages clause is reasonable under the totality of these considerations.

We find that the totality of the circumstances—as evidenced by the *Wassenaar* factors, other purposive factors, and policies for the reasonableness test—evidences that the stipulated damages clause was reasonable. The trial court, therefore, erred when it applied the doctrine of mitigation of damages after deeming the stipulated damages clause to be unreasonable as a matter of law. The court of appeals similarly erred in affirming the

---

[12] It is conceivable that Schlitz could have purchased corporate loyalty by increasing the salaries of key employees, thereby increasing the employees' opportunity costs for leaving Schlitz. However, Schlitz may have felt that the least expensive method to purchase such loyalty was through the stipulated damages mechanism. The former method would require perhaps significant salary increases to seventy employees; the latter would require payment of the stipulated amount only upon a breach of a given contract.

trial court and in applying the doctrine of mitigation of damages to the fringe benefits award.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court with instructions to reinstate the jury's verdict.