Glenn D. SEALOCK, Petitioner,

v.

TEXAS FEDERAL SAVINGS & LOAN
ASSOCIATION, Respondent.

No. C–7026.

Supreme Court of Texas.

June 15, 1988.

Rehearing Denied Sept. 14, 1988.

Russell H. McMains, McMains & Constant, Corpus Christi, Prof. Wm. V. Dorsaneo, III, Koons, Rasor, Fuller & McCurley, Bill Reed, Dallas, Mike Hatchell, Ramey, Flock, Hutchins, Jeffus, Crawford & Harper, Tyler, for petitioner.

Robert W. Coleman, John E. Richards, Baker, Mills & Glast, P.C., Dallas, Groce, Locke & Hebdon, Thomas H. Crofts, Jr., San Antonio, Robert B. Payne, Payne & Vendig, Dallas, for respondent.

ON MOTION FOR REHEARING

SPEARS, Justice.

We grant in part Texas Federal Savings & Loan Association's motion for rehearing, withdraw our opinion and judgment delivered April 27, 1988, and substitute the following:

This case concerns the interpretation of a "golden parachute" provision in an employment contract. Petitioner Glenn D. Sealock entered into a written employment agreement with respondent Texas Federal Savings & Loan Association. The agreement contained a provision commonly referred to as a "golden parachute," which guaranteed Sealock certain severance benefits if Sealock was fired after a specified change in corporate ownership or control. Thereafter, Texas Federal merged with another savings and loan, which was the subsidiary of a Delaware holding company. Sealock was then fired by Texas Federal, and Sealock sued the company for compensation under the golden parachute provision.

The trial court held that Sealock was entitled to the severance benefits under the provision. The court of appeals reversed the trial court judgment and rendered judgment that Sealock take nothing. 737 S.W. 2d 870. We reverse the judgment of the court of appeals and remand the cause to

that court for a consideration of the points of error not previously reached.

Sealock was hired by Texas Federal in 1978 as a senior vice-president in charge of data processing operations. At that time, Texas Federal was a publicly-owned Texas corporation. In 1981, Sealock signed a written employment contract which contained the following golden parachute provision:

6.  *Termination*

.    .    .    .    .

b.  If, during the term of this contract, *ownership of 10 percent (10%) or more of the outstanding voting securities of Texas Federal become vested in any person or group of persons acting in concert* and subsequent to the vesting of such ownership Texas Federal terminates the employment of Employee, for any reason other than theft, or commission of a felony in the course of employment[,] the parties contemplate that the damages resulting to the Employee from such determination will be difficult to ascertain. Accordingly, in such circumstances, Texas Federal agrees to pay to the Employee, as liquidated damages and not as penalty, *an amount equal to twice the Employee's then total annual compensation;* that amount of compensation is mutually determined to be reasonable by the parties. (emphasis added)

The employment contract defines "total annual compensation" as "the aggregate of the Employee's annual salary and fringe benefits provided to the Employee by Texas Federal as additional compensation." The contract further states that the term "fringe benefits" includes any additional compensation, "such as insurance, pension, bonus [and] stock options."

In 1983, the directors and officers of Texas Federal organized a holding company, Texas Federal Financial Corporation (TFFC), as a Delaware corporation. In addition, a second savings and loan association, New Texas Federal Savings & Loan Association, was organized as a wholly-owned subsidiary of TFFC. On September 8, 1983, Texas Federal merged with New Texas in a transaction often described as a "reverse triangular merger." The merger resulted in a wholly-owned subsidiary of TFFC that retained Texas Federal's name. Upon the merger becoming effective, all outstanding shares of Texas Federal stock were converted into the right to receive shares of TFFC stock on a share-for-share basis. All of Texas Federal's shareholders surrendered their Texas Federal stock to TFFC and received TFFC stock in exchange. The post-merger Texas Federal, however, still retained all of the assets, liabilities, officers, directors, by-laws, and Articles of Incorporation of the pre-merger Texas Federal. The sole purpose of the merger, according to Texas Federal's proxy statement, was to establish a Delaware savings and loan holding company.

Sealock was fired by Texas Federal on September 19, 1983, eleven days after the September 8th merger. Texas Federal refused to pay Sealock the benefits allegedly due him under the golden parachute provision of his employment contract. Sealock subsequently sued Texas Federal for breach of the employment contract. The trial court held that as a matter of law the reverse triangular merger triggered the golden parachute provision for liquidated damages and that Sealock was therefore entitled to recover double his total annual compensation. The jury found Sealock's total annual compensation to be $395,000. Based upon that jury finding, the trial court rendered judgment in favor of Sealock for $790,000 in damages, plus prejudgment interest and attorney's fees.

With one justice dissenting, the court of appeals reversed the trial court judgment and rendered judgment that Sealock take nothing. The court of appeals held that the Texas Federal stock did not become vested in any person, as required under the golden parachute provision, because the Texas Federal shares "disappeared" in the merger; consequently, the golden parachute provision never took effect.

The term "golden parachute" refers to a provision in an employment contract that protects key executives in the event of a

change in ownership or control within the company. ABA Subcommittee on Executive Compensation, *Executive Compensation: A Road Map for the Corporate Advisor*, 40 BUS.LAW. 219, 348 (1985). Such provisions have generally been upheld as valid, absent a showing that the parachute agreement was entered into during an ongoing takeover attempt. *See, e.g., Wolgin v. Simon*, 722 F.2d 389, 392–93 (8th Cir. 1983); *Buckhorn, Inc. v. Ropak Corp.*, 656 F.Supp. 209, 232–33 (S.D.Ohio 1987); *Koenings v. Joseph Schlitz Brewing Co.*, 123 Wis.2d 490, 368 N.W.2d 690, 697–98, 698 n. 23 (Ct.App.), *rev'd on other grounds*, 126 Wis.2d 349, 377 N.W.2d 593 (1985). *See generally* Comment, *Future Executive Bail Outs: Will Golden Parachutes Fill the American Business Skies?*, 14 TEX. TECH.L.REV. 615, 623–25 (1983). Sealock's employment contract containing the golden parachute provision was executed two years prior to the merger with New Texas, and Texas Federal has not challenged the provision as being illegal as a matter of law. Thus, the sole issue in this case is whether the September 8th merger of New Texas and Texas Federal activated the golden parachute provision in Sealock's employment contract.

In order to trigger the provision, the merger must have caused at least ten percent of Texas Federal's voting securities to become vested in a group of persons acting in concert. If the merger caused Texas Federal's stock to vest in any person, Sealock is entitled to recover the benefits under the provision.

A reverse triangular merger is a merger in which a subsidiary of an acquiring corporation is merged into a target corporation. The corporation resulting from the merger then becomes a subsidiary of the acquiring corporation. Ginnings & Jones, *Triangular Mergers in Texas*, 12 HOUS.L.REV. 307, 309 (1975). When the merger is complete, the target corporation is left as a wholly-owned subsidiary of the acquiring corporation; all of the former target corporation's shareholders have become shareholders of the acquiring corporation; and the former subsidiary of the acquiring corporation no longer exists. The reverse triangular merger is often utilized when the target corporation has nonassignable franchise rights or loans at favorable rates that may be accelerated if the corporation transfers its assets to another corporation. Such mergers are also used in acquisitions involving regulated industries, such as banks, public utilities, or insurance companies. Beller, *Final Regulations Ease Planning for Tax–Free Reverse Subsidiary Mergers*, 64 J.TAX'N 80 (1986). In addition, the Internal Revenue Code provides various mechanisms whereby this reorganization may be accomplished tax-free. *See, e.g.*, 26 U.S.C. §§ 351(a), 368(a)(1)(B), 368(a)(2)(E) (1982).

According to the proxy statement, the September 8th merger between Texas Federal and New Texas was intended to constitute a nontaxable exchange pursuant to section 351(a) of the Internal Revenue Code. Section 351(a) provides: "No gain or loss shall be recognized if property is *transferred to a corporation* by one or more persons solely in exchange for stock or securities in such corporation." (emphasis added). Texas Federal contemplated the transfer of 100% of its stock to TFFC, a separate legal entity, in exchange for TFFC stock. This exchange caused ownership of 100% of Texas Federal's stock to vest in TFFC, thus triggering Sealock's golden parachute clause.

Texas Federal contends that the merger did not result in any change of ownership of the stock because the owners of the pre-merger Texas Federal stock were also the owners of the post-merger TFFC stock. It is of no consequence to the interpretation of the golden parachute provision, however, that the same individuals owned both corporations. In order to satisfy the provision, it is sufficient that ownership of Texas Federal stock became vested "in *any* person or group of persons acting in concert." (emphasis added).

Texas Federal further argues that golden parachute provisions are intended to apply solely to hostile takeovers. The change of ownership which activates a golden parachute provision, however, does not necessarily have to result from a hos-

tile takeover. Unless stated otherwise, a friendly takeover may also trigger the provision. ABA Subcommittee on Executive Compensation, *supra,* at 350. Sealock's contract states that *any* change of ownership of Texas Federal's stock will activate the provision. There is no requirement in the provision that the change of ownership must be caused by a hostile takeover.

Prior to the September 8th merger, the directors of Texas Federal presented Sealock with a modification to his employment contract which sought to exclude the merger as an event that would activate the golden parachute provision. Sealock refused to sign the modification form. This attempted modification indicates that Texas Federal knew or suspected that the contemplated merger would trigger the provision. *See Sun Oil Company (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981).

We hold that the reverse triangular merger between Texas Federal and New Texas activated the golden parachute provision in Sealock's employment contract. Because Texas Federal fired Sealock after the merger, Sealock is now entitled to recover "twice [his] then total annual compensation."

Upon hearing the evidence, the jury determined that Sealock's total annual compensation was $395,000, an amount which included values for stock options and retirement benefits. The jury was entitled to consider evidence on stock options and the retirement plan because these benefits are expressly included in Sealock's employment contract as elements of his total compensation scheme. Further, the values assigned to each of these elements were undisputed at trial. Thus, there was evidence to support the jury's finding that Sealock's total annual compensation under his employment contract was $395,000.

Accordingly, we reverse the judgment of the court of appeals and remand the cause to that court for a consideration of the points of error not previously reached.

PHILLIPS, C.J., dissents.

PHILLIPS, Chief Justice, dissenting.

I respectfully dissent. Although I agree with the majority's interpretation of Seal-

ock's employment contract, I do not believe there is any evidence to support the award of actual damages which this court makes to Sealock. I would reverse the judgment of the court of appeals and reform the judgment of the trial court, awarding those actual damages supported by the undisputed evidence, together with attorney's fees, prejudgment interest and costs.

Under paragraph 6 of his employment contract, Sealock is entitled, once the golden parachute has been triggered, to liquidated damages upon termination in "an amount equal to twice the Employee's then total annual compensation." Under paragraph 5 of the employment contract, "total annual compensation" is defined as "the aggregate of the Employee's annual salary and fringe benefits provided to the Employee by Texas Federal as additional compensation." Under the facts of this case, Sealock is therefore entitled to recover double the sum of his annual salary at the time of his discharge plus any existing fringe benefits that he was receiving or entitled to receive as of that date.

Over Texas Federal's objection, however, the trial court merely asked the jury to find the value of Sealock's "total annual compensation," without either adding the word "then" as set forth in the contract or instructing the jury that only accrued benefits could be considered in addition to salary. The jury returned a verdict of $395,000.00, an amount far in excess of Sealock's annual salary of $71,280.00 and the fringe benefits he was then receiving. Based on this answer, the trial court rendered a judgment for Sealock of $790,000.00, together with prejudgment interest and attorney's fees.

The only evidence in the record to support the jury's answer was Sealock's own testimony regarding future stock options, future stock dividends, future tender offers, and unvested pension benefits. None of these amounts formed any part of Sealock's "then total annual compensation" at the time of his termination. The trial court erred in not submitting the issue in substantially correct form to the jury, and it further erred in permitting the jury to con-

sider evidence on damages not recoverable under the unambiguous terms of the contract. Texas Federal's conditional cross-point of error on this issue should be sustained.

Under Sealock's undisputed testimony, it is a matter of simple mathematics to calculate the elements of damage to which plaintiff is entitled. In addition to his annual salary of $71,280.00, Sealock testified that his total annual compensation for the final year of his employment included the following: a bonus of $10,000.00, country club membership dues of $2,400.00, health and life insurance premiums of $1,274.00, medical reimbursement payments of $2,233.00, and the use of an automobile valued at $8,400.00. The sum of these was his annual compensation of $95,587.00. The appropriate amount of actual damages is twice this amount, or $191,174.00, rather than $790,000.00.

I cannot understand why the majority of this court, while reaching the same result as the dissenting opinion on liability, wholly disregards the dissent's equally correct analysis on damages. 737 S.W.2d 870, 882–83 (Tex.App.1987). I would reverse the judgment of the court of appeals and reform the judgment of the trial court to award the correct amount of actual damages, attorney's fees, and appropriate prejudgment interest and costs.