TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-04-00172-CV






Southern Union Company, Appellant


v.


CSG Systems, Inc., Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT

NO. GN-100403, HONORABLE PAUL DAVIS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 Southern Union Company, a gas utility provider, contracted with CSG Systems, Inc.,
a printing company, to outsource Southern Union's print-and-mail operations. The conversion of
services was more problematic than anticipated, causing Southern Union to cease operations and sue
CSG for breach of contract. Following trial, the jury found in favor of CSG. Accordingly, the trial
court entered a final judgment awarding damages to CSG. Southern Union appeals only the amount
of damages awarded and does not challenge liability. Because there is legally sufficient evidence
in the record to support the judgment, we affirm the award except as modified.


BACKGROUND


 Beginning in the late 1990's, Southern Union experienced technological difficulties
and realized that its computer system was no longer capable of printing and mailing approximately
one million bills per month to its customers. (1) Southern Union investigated companies to which it
could outsource these operations and then requested proposals from several potential vendors. CSG
responded to Southern Union's request in February 2000. Southern Union selected CSG's bid from
the field of candidates, and the two companies engaged in formal negotiations from April until
September.

 A contract was finalized and signed by representatives from both Southern Union and
CSG as of October 13, 2000. The contract contained a "discontinuance fee" provision, obligating
Southern Union to pay a specified amount of damages to CSG in the event that Southern Union
terminated the agreement before its five-year term expired. The parties agree that the provision was
intended as a liquidated damages provision. 

 After the contract was finalized, CSG provided Southern Union with a written project
plan contemplating December 1, 2000 as the date for CSG to "go live" with the print-and-mail
operations. In the months leading up to that deadline, implementation problems arose on both sides
and the conversion fell behind schedule. The companies continued discussions in an attempt to solve
the problems until the first week of January 2001, when Southern Union ceased work on the project. 
Southern Union filed suit against CSG on February 7, asserting breach of contract among other
causes of action. 

 In its verdict, the jury found that Southern Union and CSG were both in breach of the
agreement, but that CSG's breach was excused, and that CSG would be fairly and reasonably
compensated by an award of $2.1 million for the discontinuance fee; $111,000 for the cost of paper
and envelopes purchased by CSG; $1,045,944 for CSG's lost profits; and $140,000 for the cost of
software licenses provided by CSG to Southern Union. Beneath the last element of damages, the
jury wrote "upon return of 300 licenses to CSG, the answer would be $0." The trial court determined
that, as a matter of law, it was proper to award liquidated damages in lieu of actual damages, and
therefore entered a final judgment in conformance with the jury's verdict, for a total amount of
$2,351,000, plus interest and attorney's fees.


ANALYSIS


 On appeal, Southern Union challenges the award of damages to CSG Systems,
claiming that CSG should not be awarded any liquidated damages pursuant to the discontinuance
fee provision, but rather that CSG's recovery should be confined to $1,045,944 in lost profits. 
Southern Union first asserts that, based on the timing of its breach, the proper calculation of the fee
results in a zero sum. Alternatively, Southern Union asserts that even if the proper calculation is
$2.1 million, CSG is not entitled to recover the award because that amount constitutes an illegal
penalty. Southern Union also claims that prejudgment interest should not be awarded on CSG's
damages for the discontinuance fee or lost profits. Finally, Southern Union urges that it is entitled
to a remittitur of $140,000 because it returned the software licenses to CSG.


The Discontinuance Fee Provision

 Southern Union's first issue, asserting that the timing of Southern Union's breach
results in zero damages for the discontinuance fee, turns on a construction of the provision's terms. 
We agree with the parties that the provision is unambiguous. We therefore review this issue as a
matter of law, looking only to the contract's four corners and interpreting its plain meaning. See
French v. Chevron U.S.A., Inc., 896 S.W.2d 795, 796-97 (Tex. 1995). The discontinuance fee
provision states:


The parties have mutually agreed upon the fees for the Services to be provided
hereunder based upon certain assumed volumes of processing activity, and the length
of the term of Agreement. Customer (2) acknowledges and agrees that, without the
certainty of revenue promised by the commitments set forth in this Agreement, CSG
would have been unwilling to provide the Services at the fees set forth in the
Agreement. Because of the difficulty in ascertaining CSG's actual damages for
a termination or other breach of the Agreement by Customer resulting in a
termination of this Agreement before the expiration of the then-current term,
Customer agrees that prior to such termination and in addition to all other
amounts then due and owing to CSG, Customer will pay to CSG (as a contract
and not as a penalty) an amount equal to a percentage of the total Subscriber
Statement Minimum for the remaining term of the Agreement, as defined in
Schedule C, times the then current ESP Processing Fees for the First Physical
Page, as defined in Schedule C beginning with the calendar month in which
termination occurs ("Discontinuance Fee"). If any such termination occurs
prior to the first anniversary of the Effective Date of this Agreement, the
percentage shall be fifty percent (50%). If between the first and second
anniversary of the Effective Date it shall be thirty percent (30%) and if following the
second anniversary of the Effective Date it shall be ten percent (10%). Customer
acknowledges and agrees that the Discontinuance Fee is a reasonable estimation
of the actual damages which CSG would suffer if CSG were to fail to receive the
amount of processing business contemplated by this Agreement. Customer shall
not be required to pay the Discontinuance Fee if CSG terminates this Agreement
other than as a result of Customer's breach of its obligations hereunder or if
Customer terminates the Agreement for a material, uncured breach by CSG. The
Discontinuance Fee shall be CSG's sole remedy resulting from a termination or other
breach of this Agreement by Customer resulting in a termination of this Agreement
before the expiration of the then-current term. In the event of a sale or transfer of all
or substantially all of Southern Union Company's assets to a third party, the
percentages used to calculate the Discontinuance Fee shall be twenty-five percent
(25%), fifteen percent (15%) and five percent (5%), respectively. 



(Emphasis added.) 

 The parties agree that, given the plain meaning of the relevant language, the proper
way to calculate the discontinuance fee for a breach within the first year of signing the agreement
is to multiply the applicable "Subscriber Statement Minimum" by the applicable "ESP Processing
Fees" and then take fifty percent of that total. The parties disagree, however, on how to determine
one factor of this equation: the Subscriber Statement Minimum. Southern Union asserts that,
pursuant to Schedule C, the minimum does not accrue until after the "commencement date." (3) 
Because Southern Union breached this agreement prior to the commencement date, (4) it claims that
the minimum was zero, and that the total calculation should therefore be zero. 

 CSG interprets the provision to mean that, although Schedule C prevents Southern
Union from having to pay the monthly minimum until after the commencement date, that time
restriction does not apply to Southern Union's liability under the discontinuance fee provision. CSG
asserts that Southern Union's interpretation is wrong because it allows Southern Union to breach the
contract without consequence, so long as it does so within ninety days of the commencement date,
regardless of the significant time and money invested by CSG during the implementation phase. 
According to CSG, the liquidated damages provision is most necessary during this initial time period
because of the parties' unequal contributions and because of the difficulty in calculating potential
damages before any actual profits have been made. 

 We agree with CSG's reading of the contract. Nothing in the provision limits its
applicability to a breach occurring after the commencement of services. The provision specifies the
circumstances in which Southern Union is excused from paying the discontinuance fee, and none
impose such a timing limitation. To the contrary, the provision's express terms state that Southern
Union shall be liable for the discontinuance fee, at a rate of fifty percent, should it cause "any
termination" within one year of signing the contract.

 Testimony of witnesses from both Southern Union and CSG also supports CSG's
assertion that the provision was intended to apply during the implementation phase, to protect the
significant up-front contributions made by CSG before it had received any profits from the
agreement. Pamela Vanlandingham, CSG's Senior Vice President and General Manager of the
statement processing center, testified that during November and December, the CSG team "worked
around the clock" to complete the project, which included working "very hard over the holidays,"
and that "CSG [had] expended right at 500 to 600 hours" when Southern Union breached the
contract. Southern Union officials confirmed that the nature of this contract required front-loaded
efforts by CSG and that, prior to terminating the agreement, they were aware of the money CSG
invested on supplies and equipment, and of the hours CSG put toward programming, testing, and
implementing the new system. David Kvapil, the Chief Financial Officer for Southern Union,
testified that he knew CSG had worked "well beyond the number of hours they were going to
dedicate to the project," that CSG had provided a "significant batch of bills" to Southern Union for
approval, and that CSG had spent over $100,000 on envelopes and paper by the end of December
2000. Christine Shores, a business analyst for Southern Union's mail services division, testified that
Southern Union approved the order for paper and envelopes prior to CSG placing it, and that
Southern Union was aware of the time and money spent by CSG in its efforts to commence live
operations. 

 Based on the plain meaning of the provision, as supported by the witnesses'
testimony, Southern Union's liability for the discontinuance fee is not limited to a breach occurring
after the commencement of live operations. Southern Union is liable under the discontinuance fee
for its breach of the agreement during the implementation phase. The amount of fair and reasonable
damages pursuant to the discontinuance fee was therefore properly calculated by the jury, and
affirmed by the trial court, as $2.1 million. Southern Union's first issue is overruled.


Liquidated Damages

 Southern Union claims in its second issue that, if the discontinuance fee is properly
calculated as $2.1 million, then CSG is not entitled to any recovery of that amount because it
constitutes an improper penalty. For the purposes of this case, the parties agree that the
discontinuance fee should be treated as an award of liquidated damages.

 A liquidated damages provision may only be enforced when the court finds "(1) that
the harm caused by the breach is incapable or difficult of estimation and (2) that the amount of
liquidated damages called for is a reasonable forecast of just compensation." Phillips v. Phillips, 820
S.W.2d 785, 788 (Tex. 1991). The party challenging the award of liquidated damages has the burden
to establish that the two-prong test is not satisfied and that, instead, the award of liquidated damages
is an unenforceable penalty. See Dominzo v. Progressive County Mut. Ins. Co., 54 S.W.3d 867, 875
(Tex. App.--Austin 2001, pet. denied). Whether the liquidated damages provision is enforceable
is a question of law. Phillips, 820 S.W.2d at 788. 

 Difficulty of Estimation

 Southern Union seeks to satisfy the first part of its burden by claiming that CSG's
damages were easy to estimate. Southern Union bases this claim on a "price projection" document
prepared by CSG before entering the agreement, which anticipated that CSG would earn a total profit
of $1,045,944 over the five-year term of its contract with Southern Union. Because the jury
ultimately awarded this exact amount to CSG as lost profits, Southern Union argues that CSG was
capable of precisely estimating its damages, and therefore the liquidated damages provision is an
unenforceable penalty from which CSG is not entitled to recover. The record, however, shows
otherwise.

 The language of the discontinuance fee provision supports the trial court's
determination that an award of liquidated damages was proper because CSG's actual damages were
not easy to estimate. The provision expressly states that it was included in the contract "[b]ecause
of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the
Agreement," and that "CSG would have been unwilling to provide the Services at the fees set forth
in the Agreement" had Southern Union not promised "certainty of revenue" by obligating itself to
pay the discontinuance fee in the event that it breached the contract. This provision was a bargained-for exchange, negotiated and approved by both companies.

 When a provision is mutually bargained for by equally competent parties, we give
deference to its enforcement. See Shel-al Corp. v. American Nat'l Ins. Co., 492 F.2d 87, 94 (5th Cir.
1974). Stanley Mayer, Southern Union's Chief Information Officer, testified that the provision's
terms were negotiated between attorneys representing both companies. From the face of the contract,
Southern Union understood at the time it entered the agreement that CSG's damages would be
difficult to estimate and therefore agreed a liquidated damages provision was necessary. 

 "[T]he fundamental purpose of a valid liquidated damages provision is to provide a
reasonable measure of compensation in the event of a breach where, at the time the provision is
agreed to the damages are indeterminable or will be otherwise difficult to prove." 24 Williston on
Contracts § 65:3, at 250 (4th ed. 2002). It is well established that lost profits can be inherently
difficult to estimate. See Texas Inst., Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279 (Tex.
1994). Frequently, lost profits are too speculative to recover because their calculation depends on
"uncertain and changing conditions, such as market fluctuations," and this uncertainty is heightened
where no profits have been made at the time the contract is breached. Id. The contract reflects that
Southern Union and CSG sought to avoid such speculation in agreeing to the liquidated damages
provision. The sliding scale of damages recognized the front-loaded value to be provided by CSG. 
As argued by CSG, had there not been a discontinuance fee to rely on, in the event of a breach by
Southern Union--particularly early in the contract term--then CSG would have risked being unable
to recover because of the uncertainty in calculating its lost profits.

 That CSG prepared a projection of its prices, and that the jury looked to the projection
as a reasonable calculation for lost profits, does not satisfy Southern Union's burden. The purpose
of the document was not to define CSG's potential damages. Rather, as Vanlandingham testified,
the projection was an internal tool used by CSG to outline the prices it anticipated charging for its
print-and-mail services, so that CSG could make an informed bid in response to Southern Union's
request for proposal. Vanlandingham also testified that the projection was prepared with a
"conservative accounting approach to pricing." CSG excluded several items from its calculations
because, prior to entering the contract, the parties had not assigned a value to these items. This
increased the difficulty of estimating damages. CSG's expert confirmed the difficulty of this
estimation by explaining several different ways that CSG's lost profits could be calculated, with the
results ranging between approximately $1 million to $4 million. After hearing this evidence, the jury
determined that $1,045,944 was a reasonable award of lost profits. But their verdict does not
establish that the estimation was either an easy or precise one to make. Given the mutually agreed-upon terms of the provision, and the evidence in support of its plain meaning, we are unpersuaded
by Southern Union's assertion that CSG's damages were easy to estimate.


 Reasonable Forecast of Just Compensation

 Southern Union seeks to satisfy the second part of its burden by showing that the
discontinuance fee provision is an unenforceable penalty because the amount awarded to CSG as
liquidated damages is unreasonable. Southern Union claims that this is established simply by the
fact that the $2.1 million awarded to CSG pursuant to the discontinuance fee is double the amount
found by the jury as lost profits. A liquidated damages provision will be considered an
unenforceable penalty if the amount awarded is so disproportionate to the actual or anticipated
damages that it in effect punishes the breach, thereby coercing performance of the contract by
making it too costly to not adhere to its terms. 24 Williston on Contracts § 65:3, at 249 (4th ed.
2002); see also Kothe v. R.C. Taylor Trust, 280 U.S. 224, 226 (1930).

 But Southern Union fails to cite, and we are unaware of, any cases in support of its
claim that a two-to-one ratio of liquidated-to-actual damages is unreasonable per se. There is,
however, authority to the contrary. In Baker v. International Record Syndicate, Inc., our sister court
approved a liquidated damages award of $51,000, which was more than triple the $15,000 found as
actual damages. 812 S.W.2d 53, 56 (Tex. App.--Dallas 1991, no writ). The Texas Supreme Court
also upheld a trial court's judgment awarding $790,000 in liquidated damages, which was twice the
$395,000 found as actual damages. Sealock v. Texas Fed. Sav. & Loan Assoc., 755 S.W.2d. 69, 70
(Tex. 1988).

 Southern Union seeks to distinguish such cases by urging that, even if it is normally
reasonable to award liquidated damages in an amount that is double the actual damages, this ratio
is unreasonable in a case where the amount at issue involves millions rather than thousands of
dollars, as here. Again, while no cases support Southern Union's claim, there is authority to the
contrary. In a case involving high-end commercial real estate, the Fifth Circuit held that a liquidated
damages award of $5 million was reasonable, despite an internal memorandum stating that the
anticipated damages were $1.4 million. Thanksgiving Tower Partners v. Anros Thanksgiving
Partners, 64 F.3d 227, 232 (5th Cir. 1995). Thus, as a matter of law, it is not unreasonable per se
to award liquidated damages in an amount that is double the actual damages. Moreover, in this case,
the reasonableness of CSG's award is supported by the record.

 The discontinuance fee expressly states that it "is not a penalty" and that it "is a
reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive
the amount of processing business as contemplated by this Agreement." Although parties cannot
avoid a challenge to a liquidated damages provision simply by characterizing it as "reasonable," such
express language is instructive of the parties' intent when the terms are mutually bargained for
between equally competent parties. See Shel-al Corp., 492 F.2d at 94; Loggins Constr. Co. v.
Stephen F. Austin State Univ. Bd. of Regents, 543 S.W.2d 682, 685 (Tex. App.--Tyler 1976, writ
ref'd). Southern Union's own witnesses testified that the language of the discontinuance fee
provision was bargained for and intended by the parties, and that the amount awarded under the
discontinuance fee was reasonable. In response to questions on cross-examination, Stanley Mayer
agreed that the provision was mutually negotiated, that he approved its terms, and that he knew
Southern Union would be responsible for paying the fee if it breached the contract. When David
Kvapil was asked whether he was aware at the time Southern Union filed suit against CSG "that the
calculation of the discontinuance fee would be approximately $2 million," he responded that, "Yeah. 
I think that's what it calculates to." Kvapil further agreed that Southern Union understood the
purpose of the discontinuance fee was "to compensate CSG for all the work they have done and all
their expectation" and that this was "fair."

 The jury was asked to determine what amount would be "fair and reasonable" to
award CSG pursuant to the discontinuance fee, and it responded "$2.1 million." A jury's findings
on damages should be upheld if there is sufficient evidence in the record to show that the amount
is fair and reasonable compensation. Dillard Dep't Stores, Inc. v. Silva, 148 S.W.3d 370, 371 (Tex.
2004). Here, the jury was entitled to make this finding based on both the express language of the
contract and on the testimony of Southern Union's witnesses. We find that this is sufficient evidence
from which the jury could determine that it was reasonable to award CSG $2.1 million in liquidated
damages. Southern Union's second issue is overruled.


Prejudgment Interest

 Southern Union urges in its third issue that, regardless of whether CSG is awarded
lost profits or the discontinuance fee, CSG is not entitled to recover prejudgment interest on either
award because both encompass elements of future damages, and section 304.1045 of the finance
code, as amended in 2004, specifically prohibits recovery of prejudgment interest on awards of future
damages. Tex. Fin. Code Ann. § 304.1045 (West Supp. 2004-05). CSG counters that the finance
code does not prevent prejudgment interest in this case because, by its express terms, the provision 
only applies to cases involving "wrongful death, personal injury, or property damage." Tex. Fin.
Code Ann. §§ 304.101, .1045 (West 1998 & Supp. 2004-05). Southern Union asserts in response
that, despite its express terms, section 304.1045 prevents prejudgment interest here based on the
Texas Supreme Court's holding that the statutory framework should be applied to all cases, not just
those involving "wrongful death, personal injury, and property damage." Johnson & Higgins of Tex.,
Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 514, 530 (Tex. 1998). CSG argues, however, that
even if section 304.1045 prevents prejudgment interest on future damages in a breach-of-contract
case, it is still proper for CSG to recover prejudgment interest on the amount awarded as the
discontinuance fee because it is an award of liquidated, not future, damages. We review the trial
court's award of prejudgment interest for an abuse of discretion. Purcell Const., Inc. v. Welch, 17
S.W.3d 398, 402 (Tex. App.--Houston [1st Dist.] 2000, no pet.).

 Southern Union and CSG agree that the discontinuance fee was intended to be a
liquidated damages provision. Liquidated damages are given in lieu of actual damages and thus they
are not considered "future damages," even though aspects of the liquidated award may compensate
the party for what would have otherwise been recovered as future losses. See Lafarge Corp. v. Wolff,
Inc., 977 S.W.2d 181, 188 n.13 (Tex. App.--Austin 1998, pet. denied); Eberts v. Businesspeople
Personnel Servs., Inc., 620 S.W.2d 861, 864-65 (Tex. App.--Dallas 1981, no writ). Liquidated
damages are distinct from future damages because the measure of liquidated damages is stipulated
to before the occurrence of a breach and thus, unlike future damages, the amount of liquidated
damages can be immediately ascertained at the time of the breach. See Phillips, 820 S.W.2d at 788. 
It is permissible for a trial court to award prejudgment interest when a contract "provides the
conditions on which liability depends and . . . fixes a measure by which the sum payable can be
ascertained with reasonable certainty." Wheat v. American Title Ins. Co., 751 S.W.2d 943, 944-45
(Tex. App.--Houston [1st Dist.] 1988, no writ); see also Sealock, 755 S.W.2d. at 70 (upholding
award of prejudgment interest on liquidated damages); Perry Roofing Co. v. Olcott, 744 S.W.2d 929,
932 (Tex. 1988) (Wallace, J., dissenting) ("The Legislature has given contracting parties notice that
if they enter into and subsequently breach agreements in which damages are liquidated or otherwise
ascertainable, they may be held liable for prejudgment interest. Parties to contracts have always had
this corresponding obligation and right . . . .").

 We decline to reach the issue of whether the finance code prevents recovery of
prejudgment interest on future damages in a breach-of-contract case because we agree with CSG's
argument that liquidated damages are distinct from future damages and, as such, section 304.1045
does not prohibit the recovery of prejudgment interest on liquidated damages. The trial court
therefore did not abuse its discretion in awarding prejudgment interest to CSG on the $2.1 million
it recovered pursuant to the discontinuance fee. 


Remittitur

 In its final issue, Southern Union asserts that the judgment should be modified to
remit $140,000 of CSG's damages. The jury expressly stated in the verdict that if Southern Union
returned the software licenses provided to it by CSG, then CSG would be entitled to zero damages
for the licenses. It is undisputed that Southern Union returned the licenses. The trial court awarded
CSG $140,000 for the licenses, over Southern Union's objection. CSG does not oppose a remittitur
of $140,000. Southern Union's fourth issue is sustained and we modify the judgment accordingly. 
In all other respects, the trial court's judgment is affirmed.



 

 Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear; Justice Kidd not participating 

Modified and, as Modified, Affirmed

Filed: January 27, 2005
1. At the time, Southern Union had a contract with Pitney Bowes for that company to package
the mailings after Southern Union processed and printed them, but that contract was set to expire in
December 2001.
2. The provision refers to Southern Union as "Customer." 
3. Schedule C states that, within the first year of the contract, the "minimums begin ninety
(90) days . . . following the initiation date of services ('Commencement Date'). . . ." The contract
defines the commencement date as "the first day of the calendar month in which the Services
commence." Schedule D discusses "services" as including a list of activities related to the printing,
inserting and mailing of customer bills in a specified carrier envelope, during specified billing cycles. 
4. CSG agrees that the commencement date had not yet occurred at the time of Southern
Union's breach.