# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00172-CV

**Southern Union Company, Appellant**

**v.**

**CSG Systems, Inc., Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
## NO. GN-100403, HONORABLE PAUL DAVIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Southern Union Company, a gas utility provider, contracted with CSG Systems, Inc., a printing company, to outsource Southern Union's print-and-mail operations. The conversion of services was more problematic than anticipated, causing Southern Union to cease operations and sue CSG for breach of contract. Following trial, the jury found in favor of CSG. Accordingly, the trial court entered a final judgment awarding damages to CSG. Southern Union appeals only the amount of damages awarded and does not challenge liability. Because there is legally sufficient evidence in the record to support the judgment, we affirm the award except as modified.

## BACKGROUND

Beginning in the late 1990's, Southern Union experienced technological difficulties and realized that its computer system was no longer capable of printing and mailing approximately

one million bills per month to its customers.[1]  Southern Union investigated companies to which it could outsource these operations and then requested proposals from several potential vendors.  CSG responded to Southern Union's request in February 2000.  Southern Union selected CSG's bid from the field of candidates, and the two companies engaged in formal negotiations from April until September.

A contract was finalized and signed by representatives from both Southern Union and CSG as of October 13, 2000.  The contract contained a "discontinuance fee" provision, obligating Southern Union to pay a specified amount of damages to CSG in the event that Southern Union terminated the agreement before its five-year term expired.  The parties agree that the provision was intended as a liquidated damages provision.

After the contract was finalized, CSG provided Southern Union with a written project plan contemplating December 1, 2000 as the date for CSG to "go live" with the print-and-mail operations.  In the months leading up to that deadline, implementation problems arose on both sides and the conversion fell behind schedule.  The companies continued discussions in an attempt to solve the problems until the first week of January 2001, when Southern Union ceased work on the project.  Southern Union filed suit against CSG on February 7, asserting breach of contract among other causes of action.

In its verdict, the jury found that Southern Union and CSG were both in breach of the agreement, but that CSG's breach was excused, and that CSG would be fairly and reasonably

---

[1]  At the time, Southern Union had a contract with Pitney Bowes for that company to package the mailings after Southern Union processed and printed them, but that contract was set to expire in December 2001.

compensated by an award of $2.1 million for the discontinuance fee; $111,000 for the cost of paper and envelopes purchased by CSG; $1,045,944 for CSG's lost profits; and $140,000 for the cost of software licenses provided by CSG to Southern Union. Beneath the last element of damages, the jury wrote "upon return of 300 licenses to CSG, the answer would be $0." The trial court determined that, as a matter of law, it was proper to award liquidated damages in lieu of actual damages, and therefore entered a final judgment in conformance with the jury's verdict, for a total amount of $2,351,000, plus interest and attorney's fees.

## ANALYSIS

On appeal, Southern Union challenges the award of damages to CSG Systems, claiming that CSG should not be awarded any liquidated damages pursuant to the discontinuance fee provision, but rather that CSG's recovery should be confined to $1,045,944 in lost profits. Southern Union first asserts that, based on the timing of its breach, the proper calculation of the fee results in a zero sum. Alternatively, Southern Union asserts that even if the proper calculation is $2.1 million, CSG is not entitled to recover the award because that amount constitutes an illegal penalty. Southern Union also claims that prejudgment interest should not be awarded on CSG's damages for the discontinuance fee or lost profits. Finally, Southern Union urges that it is entitled to a remittitur of $140,000 because it returned the software licenses to CSG.

**The Discontinuance Fee Provision**

Southern Union's first issue, asserting that the timing of Southern Union's breach results in zero damages for the discontinuance fee, turns on a construction of the provision's terms.

3

We agree with the parties that the provision is unambiguous.  We therefore review this issue as a matter of law, looking only to the contract's four corners and interpreting its plain meaning.  *See French v. Chevron U.S.A., Inc.*, 896 S.W.2d 795, 796-97 (Tex. 1995).  The discontinuance fee provision states:

> The parties have mutually agreed upon the fees for the Services to be provided hereunder based upon certain assumed volumes of processing activity, and the length of the term of Agreement.  Customer[2] acknowledges and agrees that, without the certainty of revenue promised by the commitments set forth in this Agreement, CSG would have been unwilling to provide the Services at the fees set forth in the Agreement.  **Because of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term, Customer agrees that prior to such termination and in addition to all other amounts then due and owing to CSG, Customer will pay to CSG (as a contract and not as a penalty) an amount equal to a percentage of the total Subscriber Statement Minimum for the remaining term of the Agreement, as defined in Schedule C, times the then current ESP Processing Fees for the First Physical Page, as defined in Schedule C beginning with the calendar month in which termination occurs ("Discontinuance Fee").  If any such termination occurs prior to the first anniversary of the Effective Date of this Agreement, the percentage shall be fifty percent (50%).**  If between the first and second anniversary of the Effective Date it shall be thirty percent (30%) and if following the second anniversary of the Effective Date it shall be ten percent (10%).  **Customer acknowledges and agrees that the Discontinuance Fee is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business contemplated by this Agreement.**  Customer shall not be required to pay the Discontinuance Fee if CSG terminates this Agreement other than as a result of Customer's breach of its obligations hereunder or if Customer terminates the Agreement for a material, uncured breach by CSG.  The Discontinuance Fee shall be CSG's sole remedy resulting from a termination or other breach of this Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term.  In the event of a sale or transfer of all or substantially all of Southern Union Company's assets to a third party, the

---

[2]  The provision refers to Southern Union as "Customer."

percentages used to calculate the Discontinuance Fee shall be twenty-five percent (25%), fifteen percent (15%) and five percent (5%), respectively.

(Emphasis added.)

The parties agree that, given the plain meaning of the relevant language, the proper way to calculate the discontinuance fee for a breach within the first year of signing the agreement is to multiply the applicable "Subscriber Statement Minimum" by the applicable "ESP Processing Fees" and then take fifty percent of that total. The parties disagree, however, on how to determine one factor of this equation: the Subscriber Statement Minimum. Southern Union asserts that, pursuant to Schedule C, the minimum does not accrue until after the "commencement date."[3] Because Southern Union breached this agreement prior to the commencement date,[4] it claims that the minimum was zero, and that the total calculation should therefore be zero.

CSG interprets the provision to mean that, although Schedule C prevents Southern Union from having to pay the monthly minimum until after the commencement date, that time restriction does not apply to Southern Union's liability under the discontinuance fee provision. CSG asserts that Southern Union's interpretation is wrong because it allows Southern Union to breach the contract without consequence, so long as it does so within ninety days of the commencement date, regardless of the significant time and money invested by CSG during the implementation phase.

_____

[3] Schedule C states that, within the first year of the contract, the "minimums begin ninety (90) days . . . following the initiation date of services ('Commencement Date'). . . ." The contract defines the commencement date as "the first day of the calendar month in which the Services commence." Schedule D discusses "services" as including a list of activities related to the printing, inserting and mailing of customer bills in a specified carrier envelope, during specified billing cycles.

[4] CSG agrees that the commencement date had not yet occurred at the time of Southern Union's breach.

5

According to CSG, the liquidated damages provision is most necessary during this initial time period because of the parties' unequal contributions and because of the difficulty in calculating potential damages before any actual profits have been made.

We agree with CSG's reading of the contract. Nothing in the provision limits its applicability to a breach occurring after the commencement of services. The provision specifies the circumstances in which Southern Union is excused from paying the discontinuance fee, and none impose such a timing limitation. To the contrary, the provision's express terms state that Southern Union shall be liable for the discontinuance fee, at a rate of fifty percent, should it cause "*any termination*" within one year of signing the contract.

Testimony of witnesses from both Southern Union and CSG also supports CSG's assertion that the provision was intended to apply during the implementation phase, to protect the significant up-front contributions made by CSG before it had received any profits from the agreement. Pamela Vanlandingham, CSG's Senior Vice President and General Manager of the statement processing center, testified that during November and December, the CSG team "worked around the clock" to complete the project, which included working "very hard over the holidays," and that "CSG [had] expended right at 500 to 600 hours" when Southern Union breached the contract. Southern Union officials confirmed that the nature of this contract required front-loaded efforts by CSG and that, prior to terminating the agreement, they were aware of the money CSG invested on supplies and equipment, and of the hours CSG put toward programming, testing, and implementing the new system. David Kvapil, the Chief Financial Officer for Southern Union, testified that he knew CSG had worked "well beyond the number of hours they were going to

6

dedicate to the project," that CSG had provided a "significant batch of bills" to Southern Union for approval, and that CSG had spent over $100,000 on envelopes and paper by the end of December 2000. Christine Shores, a business analyst for Southern Union's mail services division, testified that Southern Union approved the order for paper and envelopes prior to CSG placing it, and that Southern Union was aware of the time and money spent by CSG in its efforts to commence live operations.

Based on the plain meaning of the provision, as supported by the witnesses' testimony, Southern Union's liability for the discontinuance fee is not limited to a breach occurring after the commencement of live operations. Southern Union is liable under the discontinuance fee for its breach of the agreement during the implementation phase. The amount of fair and reasonable damages pursuant to the discontinuance fee was therefore properly calculated by the jury, and affirmed by the trial court, as $2.1 million. Southern Union's first issue is overruled.

**Liquidated Damages**

Southern Union claims in its second issue that, if the discontinuance fee is properly calculated as $2.1 million, then CSG is not entitled to any recovery of that amount because it constitutes an improper penalty. For the purposes of this case, the parties agree that the discontinuance fee should be treated as an award of liquidated damages.

A liquidated damages provision may only be enforced when the court finds "(1) that the harm caused by the breach is incapable or difficult of estimation and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). The party challenging the award of liquidated damages has the burden

to establish that the two-prong test is not satisfied and that, instead, the award of liquidated damages is an unenforceable penalty. *See Dominzo v. Progressive County Mut. Ins. Co.*, 54 S.W.3d 867, 875 (Tex. App.—Austin 2001, pet. denied). Whether the liquidated damages provision is enforceable is a question of law. *Phillips*, 820 S.W.2d at 788.

*Difficulty of Estimation*

Southern Union seeks to satisfy the first part of its burden by claiming that CSG's damages were easy to estimate. Southern Union bases this claim on a "price projection" document prepared by CSG before entering the agreement, which anticipated that CSG would earn a total profit of $1,045,944 over the five-year term of its contract with Southern Union. Because the jury ultimately awarded this exact amount to CSG as lost profits, Southern Union argues that CSG was capable of precisely estimating its damages, and therefore the liquidated damages provision is an unenforceable penalty from which CSG is not entitled to recover. The record, however, shows otherwise.

The language of the discontinuance fee provision supports the trial court's determination that an award of liquidated damages was proper because CSG's actual damages were not easy to estimate. The provision expressly states that it was included in the contract "[b]ecause of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement," and that "CSG would have been unwilling to provide the Services at the fees set forth in the Agreement" had Southern Union not promised "certainty of revenue" by obligating itself to pay the discontinuance fee in the event that it breached the contract. This provision was a bargained-for exchange, negotiated and approved by both companies.

When a provision is mutually bargained for by equally competent parties, we give deference to its enforcement. *See Shel-al Corp. v. American Nat'l Ins. Co.,* 492 F.2d 87, 94 (5th Cir. 1974). Stanley Mayer, Southern Union's Chief Information Officer, testified that the provision's terms were negotiated between attorneys representing both companies. From the face of the contract, Southern Union understood at the time it entered the agreement that CSG's damages would be difficult to estimate and therefore agreed a liquidated damages provision was necessary.

"[T]he fundamental purpose of a valid liquidated damages provision is to provide a reasonable measure of compensation in the event of a breach where, at the time the provision is agreed to the damages are indeterminable or will be otherwise difficult to prove." 24 Williston on Contracts § 65:3, at 250 (4th ed. 2002). It is well established that lost profits can be inherently difficult to estimate. *See Texas Inst., Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). Frequently, lost profits are too speculative to recover because their calculation depends on "uncertain and changing conditions, such as market fluctuations," and this uncertainty is heightened where no profits have been made at the time the contract is breached. *Id.* The contract reflects that Southern Union and CSG sought to avoid such speculation in agreeing to the liquidated damages provision. The sliding scale of damages recognized the front-loaded value to be provided by CSG. As argued by CSG, had there not been a discontinuance fee to rely on, in the event of a breach by Southern Union—particularly early in the contract term—then CSG would have risked being unable to recover because of the uncertainty in calculating its lost profits.

That CSG prepared a projection of its prices, and that the jury looked to the projection as a reasonable calculation for lost profits, does not satisfy Southern Union's burden. The purpose

of the document was not to define CSG's potential damages. Rather, as Vanlandingham testified, the projection was an internal tool used by CSG to outline the prices it anticipated charging for its print-and-mail services, so that CSG could make an informed bid in response to Southern Union's request for proposal. Vanlandingham also testified that the projection was prepared with a "conservative accounting approach to pricing." CSG excluded several items from its calculations because, prior to entering the contract, the parties had not assigned a value to these items. This increased the difficulty of estimating damages. CSG's expert confirmed the difficulty of this estimation by explaining several different ways that CSG's lost profits could be calculated, with the results ranging between approximately $1 million to $4 million. After hearing this evidence, the jury determined that $1,045,944 was a reasonable award of lost profits. But their verdict does not establish that the estimation was either an easy or precise one to make. Given the mutually agreed-upon terms of the provision, and the evidence in support of its plain meaning, we are unpersuaded by Southern Union's assertion that CSG's damages were easy to estimate.

*Reasonable Forecast of Just Compensation*

Southern Union seeks to satisfy the second part of its burden by showing that the discontinuance fee provision is an unenforceable penalty because the amount awarded to CSG as liquidated damages is unreasonable. Southern Union claims that this is established simply by the fact that the $2.1 million awarded to CSG pursuant to the discontinuance fee is double the amount found by the jury as lost profits. A liquidated damages provision will be considered an unenforceable penalty if the amount awarded is so disproportionate to the actual or anticipated damages that it in effect punishes the breach, thereby coercing performance of the contract by

making it too costly to not adhere to its terms. 24 Williston on Contracts § 65:3, at 249 (4th ed. 2002); *see also Kothe v. R.C. Taylor Trust*, 280 U.S. 224, 226 (1930).

But Southern Union fails to cite, and we are unaware of, any cases in support of its claim that a two-to-one ratio of liquidated-to-actual damages is unreasonable *per se*. There is, however, authority to the contrary. In *Baker v. International Record Syndicate, Inc.*, our sister court approved a liquidated damages award of $51,000, which was more than triple the $15,000 found as actual damages. 812 S.W.2d 53, 56 (Tex. App.—Dallas 1991, no writ). The Texas Supreme Court also upheld a trial court's judgment awarding $790,000 in liquidated damages, which was twice the $395,000 found as actual damages. *Sealock v. Texas Fed. Sav. & Loan Assoc.*, 755 S.W.2d. 69, 70 (Tex. 1988).

Southern Union seeks to distinguish such cases by urging that, even if it is normally reasonable to award liquidated damages in an amount that is double the actual damages, this ratio is unreasonable in a case where the amount at issue involves millions rather than thousands of dollars, as here. Again, while no cases support Southern Union's claim, there is authority to the contrary. In a case involving high-end commercial real estate, the Fifth Circuit held that a liquidated damages award of $5 million was reasonable, despite an internal memorandum stating that the anticipated damages were $1.4 million. *Thanksgiving Tower Partners v. Anros Thanksgiving Partners*, 64 F.3d 227, 232 (5th Cir. 1995). Thus, as a matter of law, it is not unreasonable *per se* to award liquidated damages in an amount that is double the actual damages. Moreover, in this case, the reasonableness of CSG's award is supported by the record.

11

The discontinuance fee expressly states that it "is not a penalty" and that it "is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business as contemplated by this Agreement." Although parties cannot avoid a challenge to a liquidated damages provision simply by characterizing it as "reasonable," such express language is instructive of the parties' intent when the terms are mutually bargained for between equally competent parties. *See Shel-al Corp.,* 492 F.2d at 94; *Loggins Constr. Co. v. Stephen F. Austin State Univ. Bd. of Regents*, 543 S.W.2d 682, 685 (Tex. App.—Tyler 1976, writ ref'd). Southern Union's own witnesses testified that the language of the discontinuance fee provision was bargained for and intended by the parties, and that the amount awarded under the discontinuance fee was reasonable. In response to questions on cross-examination, Stanley Mayer agreed that the provision was mutually negotiated, that he approved its terms, and that he knew Southern Union would be responsible for paying the fee if it breached the contract. When David Kvapil was asked whether he was aware at the time Southern Union filed suit against CSG "that the calculation of the discontinuance fee would be approximately $2 million," he responded that, "Yeah. I think that's what it calculates to." Kvapil further agreed that Southern Union understood the purpose of the discontinuance fee was "to compensate CSG for all the work they have done and all their expectation" and that this was "fair."

The jury was asked to determine what amount would be "fair and reasonable" to award CSG pursuant to the discontinuance fee, and it responded "$2.1 million." A jury's findings on damages should be upheld if there is sufficient evidence in the record to show that the amount is fair and reasonable compensation. *Dillard Dep't Stores, Inc. v. Silva,* 148 S.W.3d 370, 371 (Tex.

12

2004). Here, the jury was entitled to make this finding based on both the express language of the contract and on the testimony of Southern Union's witnesses. We find that this is sufficient evidence from which the jury could determine that it was reasonable to award CSG $2.1 million in liquidated damages. Southern Union's second issue is overruled.

**Prejudgment Interest**

Southern Union urges in its third issue that, regardless of whether CSG is awarded lost profits or the discontinuance fee, CSG is not entitled to recover prejudgment interest on either award because both encompass elements of future damages, and section 304.1045 of the finance code, as amended in 2004, specifically prohibits recovery of prejudgment interest on awards of future damages. Tex. Fin. Code Ann. § 304.1045 (West Supp. 2004-05). CSG counters that the finance code does not prevent prejudgment interest in this case because, by its express terms, the provision only applies to cases involving "wrongful death, personal injury, or property damage." Tex. Fin. Code Ann. §§ 304.101, .1045 (West 1998 & Supp. 2004-05). Southern Union asserts in response that, despite its express terms, section 304.1045 prevents prejudgment interest here based on the Texas Supreme Court's holding that the statutory framework should be applied to all cases, not just those involving "wrongful death, personal injury, and property damage." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514, 530 (Tex. 1998). CSG argues, however, that even if section 304.1045 prevents prejudgment interest on future damages in a breach-of-contract case, it is still proper for CSG to recover prejudgment interest on the amount awarded as the discontinuance fee because it is an award of liquidated, not future, damages. We review the trial

13

court's award of prejudgment interest for an abuse of discretion. *Purcell Const., Inc. v. Welch,* 17 S.W.3d 398, 402 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

Southern Union and CSG agree that the discontinuance fee was intended to be a liquidated damages provision. Liquidated damages are given *in lieu of* actual damages and thus they are not considered "future damages," even though aspects of the liquidated award may compensate the party for what would have otherwise been recovered as future losses. *See Lafarge Corp. v. Wolff, Inc.*, 977 S.W.2d 181, 188 n.13 (Tex. App.—Austin 1998, pet. denied); *Eberts v. Businesspeople Personnel Servs., Inc.*, 620 S.W.2d 861, 864-65 (Tex. App.—Dallas 1981, no writ). Liquidated damages are distinct from future damages because the measure of liquidated damages is stipulated to before the occurrence of a breach and thus, unlike future damages, the amount of liquidated damages can be immediately ascertained at the time of the breach. *See Phillips*, 820 S.W.2d at 788. It is permissible for a trial court to award prejudgment interest when a contract "provides the conditions on which liability depends and . . . fixes a measure by which the sum payable can be ascertained with reasonable certainty." *Wheat v. American Title Ins. Co.*, 751 S.W.2d 943, 944-45 (Tex. App.—Houston [1st Dist.] 1988, no writ); *see also Sealock*, 755 S.W.2d. at 70 (upholding award of prejudgment interest on liquidated damages); *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 932 (Tex. 1988) (Wallace, J., dissenting) ("The Legislature has given contracting parties notice that if they enter into and subsequently breach agreements in which damages are liquidated or otherwise ascertainable, they may be held liable for prejudgment interest. Parties to contracts have always had this corresponding obligation and right . . . .").

We decline to reach the issue of whether the finance code prevents recovery of prejudgment interest on future damages in a breach-of-contract case because we agree with CSG's argument that liquidated damages are distinct from future damages and, as such, section 304.1045 does not prohibit the recovery of prejudgment interest on liquidated damages. The trial court therefore did not abuse its discretion in awarding prejudgment interest to CSG on the $2.1 million it recovered pursuant to the discontinuance fee.

**Remittitur**

In its final issue, Southern Union asserts that the judgment should be modified to remit $140,000 of CSG's damages. The jury expressly stated in the verdict that if Southern Union returned the software licenses provided to it by CSG, then CSG would be entitled to zero damages for the licenses. It is undisputed that Southern Union returned the licenses. The trial court awarded CSG $140,000 for the licenses, over Southern Union's objection. CSG does not oppose a remittitur of $140,000. Southern Union's fourth issue is sustained and we modify the judgment accordingly. In all other respects, the trial court's judgment is affirmed.

_____

Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear; Justice Kidd not participating

Modified and, as Modified, Affirmed

Filed:   January 27, 2005

15